UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FAROOQ KHAN, M.D.,

                              Plaintiff,

              v.

PROVIDENT LIFE and ACCIDENT INSURANCE
COMPANY,

                              Defendant.
_____

**REPORT
and
RECOMMENDATION**

15-CV-00811A(F)

APPEARANCES:        ROBERT J. ROSATI, ESQ.
                    Attorney for Plaintiff
                    6485 N. Palm Avenue
                    Suite 105
                    Fresno, California  93704

                    RUPP, BAASE, PFALZGRAF, CUNNINGHAM LLC
                    Attorneys for Defendant
                    MATTHEW D. MILLER, of Counsel
                    424 Main Street
                    Suite 1600
                    Buffalo, New York  14202

## JURISDICTION

        On October 30, 2015, this case was referred to the undersigned by Honorable

Richard J. Arcara for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The action is presently before the court on

motions filed August 1, 2016, including Defendant's motion for judgment on the

administrative record (Dkt. 23), and Plaintiff's amended motion for summary judgment

(Dkt. 25).

## BACKGROUND

Farooq Khan, M.D. ("Plaintiff" or "Dr. Farooq"), commenced this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), on September 10, 2015, asserting a claim for declaratory relief requiring Defendant Provident Life and Accident Insurance Company ("Defendant" or "Provident"), pay disability benefits to Plaintiff under the terms of an employer sponsored individual disability insurance policy Plaintiff purchased from Defendant.  Provident's answer was filed on October 29, 2015 (Dkt. 10).  On July 27, 2016, the Administrative Record relative to Plaintiff's benefits application ("AR") was filed under seal.  (Dkt. 22).

On August 1, 2016, Defendant moved for judgment on the administrative record (Dkt. 23) ("Defendant's Motion"), attaching the Affidavit of Steven P. Carlson (Dkt. 23-1), and the Memorandum in Support of Defendant's Motion for Judgement on the Administrative Record (Dkt. 23-2) ("Defendant's Memorandum").  Also filed on August 1, 2016, was Plaintiff's amended motion for summary judgment (Dkt. 25) ("Plaintiff's Motion),[1] attaching Plaintiff's Separate Statement of Undisputed Material Facts in Support of Motion for Summary Judgment/Alternative Motion for Judgement Pursuant to Rule 52 (Dkt. 25-1) ("Plaintiff's Statement of Facts"), the Declaration of Robert J. Rosati, Esq. in Support of Motion for Summary Judgment/Alternative Motion for Judgmnt Pursuant to Rule 52 (Dkt. 25-2) ("Rosati Declaration"), and Plaintiff's Memorandum of Points and Authorities in Support of His Motion for Summary Judgment/Alternative Motion for Judgment Pursuant to Rule 52 (Dkt. 25-3) ("Plaintiff's Memorandum").

---

[1] Plaintiff's amended summary judgment motion superseded Plaintiff's original summary judgment motion (Dkt. 24), also filed August 1, 2016.

Filed on September 8, 2016, were the Attorney Declaration of Matthew D. Miller, Esq. (Dkt. 27) ("Miller Declaration"), the Memorandum in Opposition to Plaintiff's Motion for Summary Judgment/Alternative Motion for Judgment Pursuant to Rule 52 (Dkt. 27-1) (Defendant's Response"), Provident's Response to Plaintiff's Statement of Material Facts and in Opposition to Plaintiff's Motion for Summary Judgment Pursuant to Local Rule 56(a)(2) (Dkt. 27-2) ("Defendant's Response Statement of Facts"), and Plaintiff's Opposition to Defendant's Motion for Judgment on the Administrative Record (Dkt. 28) ("Plaintiff's Response").  On September 29, 2016, Defendant filed the Reply Memorandum in Further Support of Provident's Motion for Judgment on the Administrative Record (Dkt. 29) ("Defendant's Reply"), and Plaintiff filed the Reply Brief in Support of Motion for Summary Judgment/Alternative Motion for Judgment Pursuant to Rule 52 (Dkt. 30) ("Plaintiff's Reply"), and the Correction to Plaintiff's Separate Statement of Undisputed Material Facts in Support of Motion for Summary Judgment/Alternative Motion for Judgment Pursuant to Rule 52 (Dkt. 31) ("Plaintiff's Fact Statement Correction").  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion (Doc. No. 23), should be DENIED; Plaintiff's motion (Doc. No. 25), should be DENIED.

### **FACTS**[2]

Plaintiff Farooq Khan, M.D. ("Plaintiff" or "Dr. Khan"), is a neurologist who attended medical school and was employed for most of his medical career in the United States, although he is a citizen of Canada which Plaintiff considers as his home and where Plaintiff often sought medical treatment in connection with the medical conditions

---

[2] Taken from the pleadings, motion papers, and AR filed in this action.

for Plaintiff's alleged disabling medical condition.  Plaintiff's first symptoms of his alleged disabling condition were discovered in 2004 when Plaintiff underwent a physical examination in connection with Plaintiff's application for an unrelated disability insurance policy, and a urinalysis showed microalbuminuria and red blood cell cast characteristic of glomerular disease (kidney disease in which the part of the kidneys that filters waste and fluids from the blood is damaged), although no renal biopsy was performed at that time.  AR[3] at 000669, 000881.

On January 17, 2005, Plaintiff was examined by George Wu, M.D. ("Dr. Wu"), of Credit Valley Hospital ("Credit Valley"), in Mississauga, Ontario, Canada, for complaints of significant general fatigue, right knee arthralgia without inflammation, low back pain, and burning discomfort in his feet.  AR at 000700.  Laboratory tests showed mild proteinuria (presence of protein in the urine suggesting possible kidney damage).  *Id.* On August 24, 2005, Plaintiff underwent a total bone scan performed at Trillium Health Center, Mississauga, Ontario, by Frank Lipson, M.D. ("Dr. Lipson"), whose impression was possible polyarthropathy, and further evaluation by MRI for unusual uptake of the proximal tibiae.  AR at 000474-76.  Diagnostic radiology tests of Plaintiff's tibia, fibula, and knees on August 24, 2005 revealed no bone or joint abnormality.  *Id.* at 000477-478.  Upon examining Plaintiff on August 25, 2005, Dr. Wu reported Plaintiff had a history of arthralgia in the knee area, with a bone scan positive for increased uptake in the tibial fibular junction, but without any definitive diagnosis of a rheumatological issue. *Id.* at 691.  Diagnostic tests were ordered.  *Id.* at 692.

---

[3] References to "AR" are to the Administrative Record for Claim File # 926965, filed in two parts in Dkt. 22, including as PLA-CL-IDI-000001-713, and PLA-CL-IDI-0000714-1401.  For ease of reference, AR citations include only the Bates Stamp page number, but not the full file name.

In 2006, Plaintiff sought medical treatment for a red left eye, which was initially diagnosed as episcleritis (irriation and inflammation of the episclera – a thin layer of tissue covering the white of the eye).  AR at 1295.  When the eye condition did not respond to topical corticosteroids, Plaintiff sought treatment from Calvin W. Breslin, M.D. ("Dr. Breslin"), an ophthalmologist at the University of Toronto, Ontario, Canada, who diagnosed scleritis (irritation and inflammation of the white of the eye), for which the corticosteroid Prednisone was prescribed.  *Id.*  After four days of treatment, the scleritis was 70% improved, *id.* at 678, but, Plaintiff was not able to completely discontinue the Prednisone and has since required a daily dosage of 10 mg to maintain a moderate level of functioning.  *Id.* at 001295.

On October 16, 2006, Plaintiff was examined by Dr. Wu for complaints of increasing headaches which sometimes caused Plaintiff to vomit. AR at 000678.   A total bone scan performed November 24, 2006, at Toronto General Hospital showed arthritic changes in both knees, both sternoclavicular joints (between the sternum and clavicles), and the small joints of both hands and feet.  *Id.* at 000680.

Upon examination by Dr. Wu on April 30, 2007, Plaintiff complained of pain at the tibial-fibular joint, fatigue, and paresthesia (tingling and numbness) for which Dr. Wu encouraged Plaintiff to undergo a nerve conduction study to rule out peripheral neuropathy. AR at 000674.

On August 16, 2007, Plaintiff was examined by rheumatologist Yan Liu, M.D. ("Dr. Liu"), who noted Plaintiff complained of developing increasing polyarticular pain involving both small and large joints for the past year, and migraine headaches.  AR at 000669.  Physical examination was largely unremarkable and Dr. Liu's impression was

possible small-medium vessel vasculitis (inflammation of blood vessels), either
microscopic polyangiitis ("MPA"), polyarteritis nodosa ("PAN"), Wegener's
granulomatosis ("Wegener's"), for which Dr. Liu ordered "a full battery of tests," and
prescribed Celebrex (non-steroidal anti-inflammatory drug).  *Id.* at 000670.  When Dr.
Liu next examined Plaintiff on November 26, 2007, in follow-up for possible vasculitis,
Plaintiff's serology was unremarkable, but because Plaintiff complained of left Achilles
enthesitis (inflammation of the Achilles tendon), Dr. Liu ordered a sural nerve (sensory
nerve in the calf region) biopsy, and Dr. Liu also arranged for monitoring and diagnostic
tests for light-headedness and dizziness.  *Id.* at 000661.  At a November 28, 2007
examination by Dr. Wu, Plaintiff complained of polyarthralgia, yet his scleritis had
resolved.  *Id.* at 000658-59.

Dr. Liu examined Plaintiff on February 29, 2008, for proteinuria, joint pain,
inflammatory eye disease, and hypertension.  AR at 000650.  Plaintiff was tender along
both pre-Achilleal bursitis and left elbow olecranon bursitis, and Dr. Liu remarked that
once Plaintiff's blood pressure was better controlled, optimum use of Celebrex was
possible, but until then, Pennsaid (osteoarthritis medication), and cortisone therapy
were offered.  *Id.*  Despite continuing problematic joint pain, Plaintiff was reticent to
undergo tissue diagnosis.  *Id.*  Plaintiff has remained on Prednisone which has helped
control his arthritis symptoms, but has exacerbated the pervasive fatigue.  *Id.* at
000882.

On March 18, 2009, Plaintiff was examined at the Vasculitis Clinic of Mount Sinai
Hospital in Toronto, Ontario ("the Vasculitis Clinic"), by rheumatologist Simon Carette,
M.D. ("Dr. Carette"), complaining of progressive anorexia, decreased energy, burning

sensations in both hand and feet with a symmetrical distribution, and left sub-costal fullness without pain, nausea, vomiting, modification of stool patterns or blood.  AR at 000590-91.  Plaintiff's concerns included clinical findings suggestive of severe scleritis, for which Plaintiff had self-treated for a year with Prednisone, diabetes and risk of pancreatitis based on very high triglycerides, neuropathy, sub-optimally treated hypertension, and previous evidence of glomerulonephritis.  *Id.*  Dr. Carette suspected possible Wegener's granulomatosis, which would be unusual given Plaintiff's stable clinical picture for the previous two years, or a combination of glomerulonephritis and enthesitis, although such diagnosis would not explain the scleritis.  *Id.* at 000592.  Dr. Carette encouraged Plaintiff to seek medical care from "a family physician in order to avoid self-investigation and treatment," and requested fasting blood work and follow-up in two weeks, *id.*, but Plaintiff did not then return to the Vasculitis Clinic as directed.  *Id.* at 000590.

On March 19, 2009, Plaintiff was again examined by Dr. Breslin in Toronto for active scleritis.  AR at 000515.  Dr. Breslin reported the dosage of Plaintiff's Prednisone resulted in "all the side-effects and none of the benefits," *id.*, and Plaintiff was told to add Imuran and increase the Prednisone dosage to 60 mg a day, and then gradually taper Prednisone when the red eye became white.  *Id.*

On March 20, 2009, Plaintiff was examined by Dr. Wu who reported Plaintiff had laboratory tests the previous day for which Plaintiff was awaiting the results as well as Dr. Carette's assessment.  AR at 000516-517.  Dr. Wu attributed Plaintiff's Type II diabetes to the Prednisone which had "significantly" improved Plaintiff's scleritis and polyarthralgia, and which Plaintiff had tapered from 40 mg to 10 mg.  *Id.*  It was Dr. Wu's

impression that Plaintiff would continue treatment with a low dose of steroid and Imuran, and Plaintiff was asked to change his hypertension medication to Avapro to reduce proteinuria and prevent diabetic kidney damage.  *Id.*

At some point in 2009, Plaintiff began treating with Rheumatologist Larry W. Moreland, M.D. ("Dr. Moreland"), of the University of Pittsburgh Medical Center ("UPMC"), Arthritis and Autoimmunity Center.  AR at 000882.[4]  Dr. Moreland diagnosed Plaintiff with polyarthritis, not otherwise specified, and continued Prednisone.  *Id.*  When Plaintiff subsequently developed pain in his left ear, Dr. Moreland concluded Plaintiff was suffering from relapsing polychondritis,[5] a progressive, rheumatological disorder.  *Id.*  On May 20, 2011, Plaintiff returned to Dr. Moreland for follow-up.  *See* AR at 000399-401.

Despite the relapsing polychondritis diagnosis, on October 24, 2011, Plaintiff commenced employment as a neurologist at Mount St. Mary's Hospital in Lewiston, New York ("the Hospital"), a subsidiary of Ascension Health, Inc., Plaintiff's employer. In connection with the commencement of his employment with the Hospital, Plaintiff underwent a physical examination performed by the Hospital's Employee Health Services, the results of which were normal.  AR at 000967.  On a Baseline Health Assessment completed on September 12, 2011, Plaintiff indicated he had no current disability requiring restricted activity, and could perform the essential functions of his job without any accommodation.  *Id.* at 000968.  Plaintiff disclosed he had been diagnosed with rheumatism, arthritis, high blood pressure, and diabetes, and had a history of sciatica, *id.* at 000969, 000972, was in good health and had experienced pain in his

---

[4] No treatment records from Plaintiff's initial visits to Dr. Moreland are in the Administrative Record.
[5] Sometimes referred to as "recurrent polychondritis."  *See, e.g.*, AR at 000028.

joints for two years, *id.* at 000970, and his medications included Metoprolol for high blood pressure, insulin for diabetes, and Prednisone for arthritis. *Id.* at 000971.

Through his employment at the Hospital, Plaintiff applied on June 15, 2012, for an individual disability benefit policy from Defendant Provident Life and Accident Insurance Company ("Defendant" or "Provident"), who then issued to Plaintiff Policy No. 06-6297809 ("the Disability Policy" or "the Policy").[6]  All claims under the Disability Policy are administered by Defendant's corporate parent and agent Unum Group ("Unum").[7]  Defendant's Response Statement of Facts ¶ 7 (admitting that "employees of Provident's parent, Unum Group, administered and made benefits determinations on plaintiff's claim on behalf of Provident.").  The Disability Policy is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et al.* ("ERISA"), and provides for a monthly disability benefit for an insured under age 64 when the relevant disability occurs, until the insured reaches age 67.  Disability Policy at 000008.  Terms of the Policy relevant to this review include that "Disability or Disabled means that You are Totally Disabled."  *Id.* at 000020.

> Total Disability or Totally Disabled, for the first 12 months of benefit payments during a Disability, means that because of Injury or Sickness:
>
> 1.   You are not able to perform the material and substantial duties of Your Occupation; and
>
> 2.   You are receiving Physician's Care. . . .
>
> After Total Disability benefits have been payable for 12 months during a Disability, then Total Disability means that because of Injury or Sickness:
>
> 1.   You are not able to perform the material and substantial duties of Your Occupation; and

---

[6] A complete copy of the Disability Policy is filed at Dkt. 22: PLA-AP(6297809)-000001-60.

[7] Unum is not a party to this action.

> 2.    You are not engaged in Any Occupation; and
>
> 3.    You are receiving Physician's Care. . . .

Disability Policy at 000022.

A rider to the Policy amends Disability to also include Residual Disability or Residually

Disabled which

> means that You are not Totally Disabled, but due to Injury or Sickness:
>
> > 1.    You are not able to perform one or more of the material and substantial duties of Your Occupation; or You are not able to perform them for as long as normally required to perform them; and
> >
> > 2.    You are receiving Physician's Care. . . .

*Id.* at 000034.

The physician's care requirement for the initial 12 months, subsequent months

coverage, and Residual Disability may be waived upon Unum's receipt of acceptable

written proof that further physician's care would not benefit the insured.  *Id.*  at 000022,

000034.  "You, Your, and Yourself refers to the Insured named in the Policy Schedule,"

*id.* at 22, here, Plaintiff, whereas "We, Our, and Us refers to the Provident Life and

Accident Insurance Company and its affiliates."  *Id.*  "Your Occupation" is defined as

"the occupation or occupations in which You are regularly engaged at the time You

become Disabled."  *Id.*  "Any Occupation means Any Occupation for which You are

reasonably fitted based on education, training or experience."  *Id.* at 000020.  "Sickness

means sickness or disease that first manifests itself after the Effective Date and while

Your Policy is in force."  *Id.* at 000021.  The Disability Policy's "Effective Date" is the

date the "Policy, rider or policy change takes effect" as shown in the Policy Schedule, *id.*

at 000020, here, July 1, 2012.  *Id.* at 000001.  A 180-day elimination period must elapse

during a disability before any benefits are payable, Disability Policy at 000018, and the insurer may require the insured to undergo a medical examination. *Id.* at 000027. In Part 5 of the Disability Policy, pertaining to Claims, the section titled "Written Proof of Loss" provides that "We can require any proof that We consider necessary to consider Your claim. This may include medical information, personal and business tax returns filed with the Internal Revenue Service, financial statements, accountant's statements or other proof acceptable to Us." *Id.* at 000023. The Disability Policy also provides that a claimant can be required to submit to a medical examination, *id.*, the failure to submit to a medical examination may result in the denial of benefits, *id.*, and the claimant "has the responsibility to obtain all reasonably appropriate Physician's Care and treatment for the condition upon which the claim for benefits under the Policy is based." *Id.* The Disability Policy does not include any provision limiting payment of benefits under the Policy for any disability primarily based on self-reported or subjective symptoms.

Throughout his employment at the Hospital, Plaintiff's relapsing chondritis symptoms continually worsened, rendering it difficult for Plaintiff to get up in the morning, leaving Plaintiff without energy, lightheaded, dizzy, and easily fatigued. AR at 000881-882. Plaintiff maintains that he regularly took naps throughout the day so as to maintain full consciousness. *Id.* at 000882-883. During times that Plaintiff was on call at the Hospital for seven days straight, Plaintiff could barely function after a few days, was unable to stand for more than five minutes, sat through patient consultations, and held onto patients' beds to avoid falling down. *Id.* at 000883. Plaintiff continued to have severe pain, particularly in his knees, and limped noticeably throughout the course of the day at the Hospital. *Id.* Although Prednisone caused Plaintiff to become

confused, Plaintiff continued to take it "because it was the only medication that even partially controlled the more debilitating symptoms." *Id.*

After commencing employment at the Hospital, Plaintiff sought treatment from a new primary care physician, Todd M. Orszulak, D.O. ("Dr. Orszulak"), located near Plaintiff's home in Lewiston, New York. Upon his initial examination of Plaintiff on May 2, 2012, Dr. Orszulak diagnosed hypertension, elevated glucose, proteinuria, vitamin D deficiency, BPH (benign prostatic hyperplasia), fatigue and malaise, scleritis with corneal involvement, and screening for rheumatoid arthritis. *Id.* at 001316-1317. Dr. Orszulak prescribed medication for hypertension, and elevated glucose, continued Prednisone, and blood pressure medication, and ordered laboratory tests related to hypertension, elevated glucose, rheumatoid arthritis, proteinuria, unspecified vitamin D deficiency, and fatigue and malaise. AR at 001317-1318.

On June 13, 2012, Plaintiff was examined in follow-up by Dr. Orszulak who assessed uncontrolled Type II diabetes mellitus without complications, hypertension, hyperlipidemia, vitamin D deficiency, and polyneuropathy in diabetes. AR at 001313-1315. Plaintiff was prescribed medications and supplements for diabetes, neuropathy, and hyperlipidemia; Prednisone and hypertension medications were continued, and laboratory tests were ordered. *Id.*

At a patient education visit to Dr. Orszulak's office on June 21, 2012, RN Crystal Frazier instructed Plaintiff on how to use a glucometer to check blood sugar levels, how to maintain a glucose readings log, and reviewed dietary considerations for diabetics. AR at 1319.

At a follow-up appointment on September 17, 2012, Dr. Orszulak assessed uncontrolled Type II diabetes mellitus without complications, proteinuria, hyperlipidemia, and hypertension.  AR at 001321-1322.  Dr. Orszulak ordered laboratory tests for all four diagnosed conditions, prescribed Exforge for hypertension and supplements for hyperlipidemia, continued other blood pressure medication, Prednisone, and vitamin D. *Id.* at 001322-1323.

At a January 24, 2013 follow-up appointment, Dr. Orszulak assessed Plaintiff with hyperlipidemia, hypertension, Type II diabetes mellitus without complications, fatigue and malaise, elevated blood pressure, and BPH.   AR at 278-80.  Dr. Orszulak prescribed medication for the hyperlipidemia, hypertension, and diabetes mellitus, and ordered laboratory tests.  *Id.*

On March 27, 2013, Plaintiff was examined by Dr. Orszulak both for follow-up and for worsening fatigue.  AR at 285-87.  Dr. Orszulak assessed Type II diabetes mellitus, controlled and without complications, scleritis with corneal involvement, chondritis (cartilage inflammation) of pinna (external ear), vitamin D deficiency, hyperlipidemia, polyneuropathy in diabetes, fatigue and malaise.  *Id.*  Dr. Orszulak continued medications and treatment protocol for diabetes, hypertension, Prednisone, vitamins and supplements, and ordered laboratory tests for diabetes, vitamin D deficiency, hyperlipidemia, and fatigue and malaise.  *Id.*

On April 23, 2013, Plaintiff underwent a rheumatology evaluation by Ernesto Levy, M.D. ("Dr. Levy"), with Invision Health Brain and Spine Center in Williamsville, New York.  AR 001295-1298.  Dr. Levy's impression was that Plaintiff presented "a high-complexity case, as no clear localizing manifestation exists.  The more compelling

manifestations include arthralgia, fatigability (at some times extreme), scleritis (well documented), and intolerance to a prednisone taper." *Id.* at 001297. Dr. Levy noted Plaintiff had "undergone numerous tests, which have yielded negative results." *Id.* Dr. Levy's "diagnostic considerations" included systemic vasculitis, rheumatoid arthritis, polychondritis, systemic lupus erythematosus, and an HLA-B27-mediated disease (inflammatory disease associate with HLA antigen, sometimes manifested in the eye). Dr. Levy considered that Plaintiff's chronic fatigue and malaise could be manifestations of Plaintiff's Prednisone withdrawal such that Plaintiff should try a steroid-sparing agent under close monitoring to help withdrawal, and opined Plaintiff should undergo additional testing to correctly diagnose Plaintiff. *Id.* at 001297-1298.

On May 3, 2013, Plaintiff was examined in follow-up by Dr. Moreland for the first time since May 20, 2011, when Plaintiff's medical problems included, as relevant, relapsing polychondritis, history of intermittent pain and swelling of ears and nose, history of scleritis, nonspecific polyarthritis, severe fatigue, probable osteoarthritis, vitamin D deficiency, osteopenia, hypertension, hyperlipidemia, and steroid-induced diabetes. AR at 000399-400. Plaintiff's medications included Prednisone, Exforge (blood pressure), Lipitor (cholesterol), calcium, insulin, omega-3 fatty acids, and Kombiglyze (diabetes). *Id.* at 400. Dr. Moreland's impression was "relapsing polychondritis based on clinical symptoms," as well as based on "workup at Canada," and Plaintiff's history of "proteinuria, scleritis, low complement level, severe fatigue and polyarthralgias," *id.*, and Plaintiff also had hypertension, osteoarthritis based on X-ray films, history of vitamin D deficiency, and osteopenia and diabetes, both of which Dr. Moreland attributed to Plaintiff's use of steroids. *Id.* Dr. Moreland ordered "additional

laboratory studies to monitor for disease activity and severity," and recommended Plaintiff "stop work completely based on his current medical problems." *Id.*  According to an Attending Physician Statement ("APS") completed on May 3, 2013, Dr. Moreland advised that Plaintiff was disabled by severe chronic joint pain, fatigue, and recurrent polychondritis, which Dr. Moreland observed by clinical evaluation, that Plaintiff was disabled and would never be able to resume working.  AR at 000028.  Also on May 3, 2013, Dr. Moreland, in connection with Plaintiff's application for short term disability benefits under the Provident Disability Policy, completed the APS relative to Unum's Short Term Disability Claim Form, indicating Plaintiff was disabled by relapsing polychondritis and polyarthritis for which Plaintiff's treatment plan included daily Prednisone and "other medications for other medical problems." *Id.*  at 000042-44.  Dr. Moreland indicated Plaintiff's restrictions as severe joint pain, fatigue, recurrent polychondritis, based on clinical evaluation, and that Plaintiff was never to return to either full time or part time work.  *Id.* at 000044.

At Plaintiff's May 30, 2013 annual examination, Dr. Orszulak assessed Plaintiff with a disorder of bone and cartilage, hyperlipidemia, Type II diabetes mellitus without complications, hypertension, proteinuria, vitamin B12 deficiency, tobacco abuse, vitamin D deficiency, neuropathy, and BPH.  AR 281-84.  Dr. Orszulak prescribed medications and supplements for hyperlipidemia, hypertension, neuropathy, and vitamin D deficiency, continued Plaintiff's diabetes medications and protocol, and Prednisone, ordered laboratory tests for the bone and cartilage disorder, diabetes, hypertension, proteinuria, and BPH.  *Id.*

On June 10, 2013, Plaintiff applied with Unum under the Disability Policy for short-term disability benefits ("short-term disability claim"), reporting his last day of work was June 9, 2013, and that he was disabled based on polychondritis (inflammation of cartilage, especially in the ears, larynx, trachea, nose, and aortic heart valve), and polyarthralgias (pain in five or more joints in the body), and the short-term disability claim was assigned Claim Number 5206297809001, to be handled by Senior Disability Benefits Specialist Beth Robinson ("Robinson").  AR at 000013, 000028-29, 000042-44.

On June 10, 2013, Plaintiff applied for long-term disability benefits under two other insurance policies, one with The Hartford and the other with MetLife.  *See* AR at 000865-880, especially 000871-872 (June 9, 2014 Letter from Michael E. Quiat, Esq. ("Quiat") to Unum advising Quiat had been retained by Plaintiff in connection with the administrative appeal).  Both applications were quickly approved.  *Id*.[8]

In a letter dated June 13, 2013, Dr. Orszulak advised the Hospital that "Dr. Khan should stop work as of June 10, 2013, based on the advice of his Rheumatologist."  AR at 000887.  Dr. Orszulak further directed the Hospital to contact Plaintiff's rheumatologist for any further information.  *Id*.

On June 28, 2013, Plaintiff completed Unum's Individual Disability Claim Form to apply for long-term disability benefits under the Disability Policy ("long-term disability benefits claim), indicating he was disabled by polychondritis, the first symptoms of which were joint pain and fatigue which Plaintiff noticed in 2006-07.  AR at 000108-116.  Plaintiff described his activities of daily living as being able to do household chores, read, and drive, but he limited his activity.  *Id*.  Plaintiff claimed his ability to work was

---

[8] The record does not indicate exactly when Plaintiff's applications for long-term disability benefits were approved by The Hartford and MetLife, but Defendant does not deny this occurred.

limited by fatigue, joint pain, difficulty walking and standing, all of which were activities required by his hospital neurologist job.  *Id.*  Plaintiff listed his physicians as Dr. Moreland and Dr. Orszulak.  *Id.*

Plaintiff's employment with the Hospital was officially terminated on June 30, 2013, when his contract was not renewed.  AR at 000347-348.  By letter to Plaintiff dated July 15, 2013, Unum advised Plaintiff's long-term disability claim had been assigned claim number 5206297809001, and Robinson was the Disability Benefits Specialist assigned to the claim ("Disability Claim" or "Claim"). [9]  *Id.* at 000117-119.  By letter dated July 19, 2013, Robinson advised Plaintiff Unum was in receipt of Plaintiff's completed claim form, that the Disability Policy provided for a monthly base benefit of $ 6,249 up to Plaintiff's 67th birthday, and that given the 180-day non-payable elimination period and the disability date of June 10, 2013, Plaintiff's benefits would begin to accrue on December 7, 2013, with the first benefits payable on January 7, 2013.  *Id.* at 000183-185.  Robinson also requested Plaintiff forward medical records necessary for Unum to determine Plaintiff's eligibility for disability benefits.  *Id.*

On July 25, 2013, Unum issued its Research Summary Documents concerning Unum's Benefits Research Information detailing its investigation of Plaintiff's Disability Claim including, *inter alia*, checking the status of Plaintiff's previous addresses, professional licenses, search for Federal and state lawsuits and judgments, social media search, Green Card status, hobbies and activities, and possible criminal record. AR at 000190-206.

---

[9] Although not specifically stated, that Plaintiff's long-term disability claim was assigned the same number as the previously filed short-term disability claim implies both claims, for which Plaintiff applied under the Disability Policy, were merged into the Claim.

On Unum Individual Disability Status Update form completed by Plaintiff on July 29, 2013, AR 000254-264, Plaintiff reported difficulty with mobility, fatigue, and any physical exertion.  Plaintiff's activities of daily living included reading, using the computer, and occasional household chores.

On July 30, 2013, Mount Saint Mary's Director of Employee Benefits Deborah K. Nichols ("Nichols"), completed an Authorization to Collect and Disclose Information request from Unum in connection with Plaintiff's Disability Claim.  AR at 000228-234. Nichols reported Plaintiff was hired by the Hospital on October 24, 2011 to work 40 hours per week as a neurologist, but last worked on June 9, 2013, because of his claimed disability, and that Plaintiff's employment was terminated on June 30, 2013, when his physician contract with the Hospital was not renewed.  *Id.* at 000230-231.  The Hospital was not interested in having Plaintiff return to work part-time if Plaintiff indicated a desire to do so.  *Id.* at 000231.  In a July 30, 2013 file note, Robinson memorialized a telephone conversation with Nichols who reported she was "very suspect" of Plaintiff's Disability Claim given that Plaintiff was a newly hired physician, who did not mention any medical history on "an extensive medical questionnaire" when hired, and Plaintiff filed his short term disability claim two weeks before he was to be terminated when his contract was not renewed.  *Id.* at 000235.  According to Nichols, Plaintiff's contract was not renewed because Plaintiff was not meeting minimum work requirements, including surgeries, visits, etc.  *Id.*  On July 31, 2013, Robinson notified Unum's Special Investigation Unit ("SIU"), of suspected fraud based on her July 30, 2013 conversation with Plaintiff's employer, the Hospital.  *Id.* at 000250.  One Donna Vitali ("Vitali"), acknowledged receipt of Robinson's assertion, indicating the SIU was "in

receipt of the referral for suspected fraud," and that the case was assigned to

Investigator Todd Davis ("Davis").  *Id.* at 000250.  In connection with the suspected

fraud investigation, Unum conducted surveillance on Plaintiff on August 13 and 14,

2013, but because Plaintiff's activities were either unobserved or confined to the inside

of his residence, further investigative efforts were terminated.  *Id.* at 000313-315,

000318, 000328-340.

In August 2013, Plaintiff, at Unum's request, sent to Unum's vocational

consultant David P. Gaughn ("Gaughn"), billing information relative to Plaintiff's

employment at the Hospital, showing Plaintiff's billing production for the period January

1, 2013 to his last day of employment on June 9, 2013, was low, with Plaintiff seeing on

average only six patients a day.  AR at 000323, 000327, 000347-348.  Gaughn

determined, based on information in the file, that Plaintiff's Hospital neurologist position

required light exertion, defined as exerting up to 20 lbs occasionally, and 10 lbs

frequently, a significant amount of walking and standing, as well as relating to others in

a social setting, understanding, remembering, and carrying out instructions, maintaining

attention and concentration, and adhering to medical protocols and standards, making

medical judgments, communicating clearly both in writing and speaking, planning, and

organizing.  *Id.* at 000347-48.

On August 21, 2013, Plaintiff began seeing Mallika Rajarathna, M.D. ("Dr.

Rajarathna"), in Missassauga, Ontario, querying whether Plaintiff had relapsing

polychondritis.  AR 000757, 000581-583.  Dr. Rajarantha's treatment notes indicate Dr.

Rajarantha diagnosed Plaintiff with diabetes mellitus without complications,

hypertension, stable relapsing polychondritis, and hyperlipidemia.  *Id.* at 000583.

On August 29, 2013, Plaintiff completed Unum's Individual Disability Status Update Form, indicating he was unable to perform any duties of his occupation, that his activities of daily living included reading, using the computer, sleeping, and some household chores, none of which had changed since his last report.  AR at 000369-373.

In follow-up on September 4, 2013, Dr. Rajarantha diagnosed Plaintiff with hypertension and stable relapsing polychondritis.  *Id.* at 000585.

On September 9, 2013, Plaintiff was examined in follow-up by Dr. Moreland whose primary diagnosis was polychondritis, along with bone and cartilage disease, polyarthritis, hypertension, and vitamin D deficiency.  AR at 000408-415.  Laboratory test results from May 3, 2013 showed trace protein in the urine, and low vitamin D, but serum creatinine was normal.  *Id.* at 000409.  Dr. Moreland's impression was relapsing polychondritis for which Plaintiff was maintained on low dose Prednisone.  *Id.*  Dr. Moreland continued Plaintiff's medications and ordered additional laboratory tests, and Plaintiff was to return to Dr. Moreland in six months.  *Id.*

On October 3, 2013, Unum Senior Clinical Consultant Beth O'Brien, RN, BSN ("O'Brien"), completed a comprehensive review of Plaintiff's medical records that had then been provided, noting Plaintiff's physical examinations and blood work were normal and no physician had changed Plaintiff's medications in response to Plaintiff's asserted worsening condition.  AR at 000520-521.  O'Brien found Dr. Moreland's opinion that Plaintiff was "unable to work" to be "unclear and non specific," and referred the matter to Norman H. Bress, M.D. ("Dr. Bress"), a rheumatologist, to review and determine if Plaintiff's medical records supported his asserted restrictions and limitations.  *Id.*  On October 8, 2013, Dr. Bress completed his review of Plaintiff's

medical records, concluding such records did not support Plaintiff's claimed restrictions and limitations because although Plaintiff's history and physical findings were consistent with the relapsing polychondritis diagnosis, Dr. Bress was "unable to locate results of a cartilage biopsy to confirm the diagnosis." *Id.* at 000539-543.  According to Dr. Bress, Plaintiff's "minimal recent physical findings" included only slight tenderness in Plaintiff's left ear lobe, without any other findings supporting relapsing polychondritis such as ear redness or atrophy of the ears or nasal cartilage, Plaintiff was maintained only on low dose Prednisone without need for immunosuppressives, Plaintiff's most recent erythrocyte sedimentation rate (a measure of inflammation based on the rate at which red blood cells sediment in a one hour period), and C-reactive protein (indicative of inflammation) were normal, and Dr. Moreland's instruction to follow-up in six months was not consistent with active or severe relapsing polychondritis which likely would have required more frequent visits.  *Id.*  Dr. Bress further reported that Plaintiff's medical records indicated physical examinations revealed no abnormal joint findings supporting his polyarthritis diagnosis such that if Plaintiff does have "polyarthritis is present, it is extremely mild and does not support restrictions or limitations."  *Id.*  Nor did Plaintiff claim any of his co-morbid conditions, including hypertension, steroid induced diabetes, dyslipidemia, scleritis in the left eye, polyneuropathy, vitamin D deficiency, osteoarthritis, and osteopenia as impairing.  *Id.*  Accordingly, Dr. Bress concluded none of Plaintiff's impairments, either alone or in combination, supported the restrictions and limitations Plaintiff claimed, specifically, an inability to work as a hospital neurologist.  *Id.*

By facsimile to Robinson dated October 8, 2013, Unum was notified by Quiat that Plaintiff had retained Uscher, Quiat, Uscher & Russo, of Hackensack, New Jersey, for representation regarding Plaintiff's pending Disability Claim.  AR at 000544-546.

In a call summary memorializing an October 16, 2013, telephone conversation between Dr. Bress and Dr. Moreland, Dr. Moreland concurred with Dr. Bress's assessment that Plaintiff's medical records showed Plaintiff's examination findings and laboratory tests were normal, and that Plaintiff claimed to be unable to work based on fatigue.  AR at 569-70.  Dr. Bress continued that "[i]n view of these findings, Dr. Moreland stated that he is not supporting any restrictions or limitations."  *Id.*  By letter dated October 16, 2013, Dr. Bress recapitulated their previous day's conversation, including that "Dr. Moreland stated that he is not supporting any restrictions or limitations," and that Plaintiff reported being unable to work because of fatigue which was not supported by Plaintiff's medical examinations and laboratory findings.  *Id.* at 000572-73.  Dr. Bress also advised that if Dr. Moreland wished to revise his statements as recited by Dr. Bress, to provide such comments in writing by October 29, 2013.  *Id.* Dr. Moreland responded in writing on October 20, 2013, asserting that

> As a Rheumatologist I see several patients with autoimmune diseases who report fatigue as a major problem.  There is no blood test or approved questionnaire that accurately measures fatigue.  Most often patients have normal lab (routine) and exams.  So, although I have not placed any restrictions on work for Dr. Khan, he reports he cannot function with his current occupation.  So I support his claim for disability.

AR at 000618-619.

On Unum Individual Disability Status Update Attending Physician Statement dated October 23, 2013, Dr. Moreland reasserted that Plaintiff's primary diagnosis was relapsing polychondritis, accompanied by severe fatigue, polyarthralgia pain, and pain

and swelling of the ears and nose, which Plaintiff treated with a daily 10 mg dose of Prednisone. *Id.* at 000615-616. Dr. Moreland assessed Plaintiff's abilities on a daily basis as including being able to occasionally sit, stand, walk, perform fine finger movements, hand/eye coordinated movements, push/pull, climb, twist/bend/stoop, reach above shoulder level, operate heavy machinery, and lift/carry up to 10 lbs, but could never lift/carry more than 10 lbs. *Id.* According to Dr. Moreland, no improvement in Plaintiff's functional abilities was expected, Plaintiff's prognosis was poor, and Plaintiff was unable to work. *Id.* On October 24, 2013, Dr. Bress replied to Dr. Moreland's response to Dr. Bress's letter of October 16, 2013, memorializing their telephone conversation, noting in Plaintiff's Administrative Record that

> Dr. Moreland has not placed any restrictions on Dr. Khan. However, Dr. Moreland states that he is supporting disability for Dr. Khan because of the report of fatigue. Dr. Moreland does not provide any supporting evidence for his opinion, such as findings on exam that the insured appeared fatigued or chronically ill, had difficulty with movements such as rising onto and off the exam table, or other clinical findings.

*Id.* at 000621-622.

Accordingly, Dr. Bress's opinion that Plaintiff was not disabled remained unchanged. *Id.*

Also on October 24, 2013, the SIU closed their suspected fraud investigation without making any recommendation that Plaintiff's Disability Claim be denied as fraudulent. AR at 000620.

In an October 29, 2013 addendum prepared after reviewing Dr. Rajarathna's "hand written and difficult to read" office notes indicating Dr. Rajarathna diagnosed Plaintiff with relapsing polycondritis, Dr. Bress stated "there are no readable findings in the notes with regard to polychondritis," such that the records provided no information on which Dr. Bress would change his opinion. AR at 000638-639.

On November 5, 2013, Dr. Bress reviewed additional newly received medical records, including records of a "Dr. Toma" who had last evaluated Plaintiff in 2008, and advised Plaintiff by letter dated December 4, 2008, that Plaintiff "was being terminated as a patient because of 'your total disagreements with the receptionist as well as the doctor.'" AR at 000716-717. Additional medical records from Drs. Wu and Liu pertaining to 2007 through 2009 showed no definite diagnosis but vasculitis was suspected, scleritis was diagnosed, low grade proteinuria was noted, and a diagnosis of glomerulonephritis was considered. *Id.* Plaintiff noted improvement after treatment with high dose steroids, including cortisone and Prednisone, but subsequently developed steroid induced diabetes. *Id.* By letter to Dr. Rajarathna dated November 13, 2013, Dr. Bress described Plaintiff's relapsing polychondritis as "inactive" such that it posed no restrictions or limitations, and inquired whether Dr. Rajarathna concurred with that assessment. *Id.* at 000734-735.

By letter to Robinson dated November 18, 2013, Dr. Moreland clarified his position regarding Plaintiffs' restrictions and limitations, including that as a rheumatologist, Dr. Moreland had seen many patients suffering with autoimmune diseases causing significant fatigue and other symptoms, not all of which were verifiable through objective evidence, but which were no less real or debilitating. AR at 000894. Dr. Moreland summarized Plaintiff's self-reported symptoms as including "intermittent periods of dizziness, left ear pain, burning in the feet, arthralgia (causing difficulty walking and standing) and significant pain." *Id.* Positive findings upon physical examination of Plaintiff included "elevated blood pressure, tachycardia, fluid in the ears, redness in the left eye due to scleritis, decreased left nasolabial fold with mild ptosis and

swelling right knee." *Id.* Dr. Moreland concluded that "[c]learly given the above, Dr. Khan is restricted and limited from performing the regular and substantial duties of evaluating and treating patients both in the inpatient and outpatient settings. Unless and until these symptoms resolve, he will continue to be unable to perform such responsibilities." *Id.* In Unum Individual Disability Status Update Attending Physician Statement dated November 21, 2013, Dr. Moreland indicated Plaintiff remained unable to work based on relapsing polychondritis, severe fatigue, polyarthralgia pain, and pain and swelling of the ears and nose. *Id.* at 00751-752.

In a November 29, 2013 letter to Dr. Bress, Dr. Rajarathna advised he had been treating Plaintiff since August 21, 2013. AR 000757. Dr. Rajarathna was aware of Plaintiff's relapsing polychondritis diagnosis, for which Plaintiff was on Prednisone that minimally controlled Plaintiff's symptoms, with Plaintiff continuing to have feet, nose, ear lobe, jaw and facial pain, with constant burning sensations over both feet, and loosening teeth. *Id.* Plaintiff's steroid induced diabetes was not well controlled and Plaintiff experienced side effects from the prolonged use of steroids. *Id.* Plaintiff's disability affected his mental situation, and Plaintiff did not have the physical strength to maintain any function or any position for any length of time, and was never symptom free. *Id.* Dr. Rajarathna opined Plaintiff would be unable to continue his career as a neurologist. *Id.*

In a December 3, 2013 Addendum, Dr. Bress responded to Dr. Moreland's recent comments and records, rejecting Dr. Moreland's conclusion that Plaintiff is unable to work, asserting Dr. Rajarathna "lists symptoms but no physical findings," and also rejecting Dr. Rajarathna's conclusion that Plaintiff "will not be able to continue his career

as a Neurologist," AR at 000766-768, because "no restrictions or limitations are supported on a physical basis." *Id.* at 000771. On December 5, 2013, Unum in-house physician John G. Paty, M.D. ("Dr. Paty"),  reviewed Plaintiff's medical records and Dr. Bress's conclusion and concurred with Dr. Bress's determination that Plaintiff was not disabled. *Id.* at 000772-775.

In a letter to Quiat dated December 11, 2013, Robinson informed that Unum was denying Plaintiff's Disability Claim because despite Plaintiff's diagnoses of relapsing polychondritis and polyarthralgia, the medical information, including physical findings, laboratory data, the absence of medication changes, infrequent medical visits with Plaintiff's treating physician, and Plaintiff's activities of daily living do not support an impairment. AR at 000804-810 ("Initial Denial"). Robinson reported that despite repeated complaints of joint pain and polyarthritis diagnosis, Plaintiff had no abnormal joint findings or synovitis (inflammation of the synovial membrane lining joints with cavities, such as knees), to suggest the presence of such condition. *Id.* at 000805-806. Robinson also stated that Plaintiff's medical records were devoid of any indication of side effects from Plaintiff's medications, and Plaintiff's other medical conditions did not impair his ability to perform the duties of his occupation. *Id.* Because Plaintiff had thus failed to establish he was totally disabled as defined under the Disability Policy, Plaintiff's Disability Claim was denied. *Id.*

On December 24, 2013, the Hospital provided an employment statement in response to a December 9, 2013 request from Unum, indicating Plaintiff was hired on October 24, 2011, but stopped working on June 9, 2013, claiming disability based on

arthralgia, and his employment was terminated on June 30, 2013 when his contract was not renewed. AR at 000788-790, 000820-821.

On January 11, 2014, Plaintiff was awarded by the Social Security Administration ("SSA"), Social Security Disability Insurance benefits ("SSDI"), based on review of essentially the same medical records which Unum had deemed insufficient to support Plaintiff's Disability Claim. AR at 000900-903. On January 21, 2014, Robinson confirmed that based on the Hospital's information, Plaintiff was working during the 180 period prior to his application for insurance coverage, the Disability Policy was appropriately issued to Plaintiff, advising Quiat of the determination on February 4, 2014. *Id.* at 00826-829.

On April 10, 2014, Plaintiff was evaluated by Joseph M. Grisanti, M.D. ("Dr. Grisanti"), at Buffalo Rheumatology with complaints of fatigue, arthralgias, and myalgias. AR at 000896-898. At that time, Plaintiff's ANCA and ANA (antibodies indicative of autoimmune disorder) were negative, although the cANCA (antibody associated with vasculitic conditions including granulomatosis with polyangiitis), was positive in the past. *Id.* at 000896. Dr. Grisanti assessed controlled Type II diabetes mellitus without complications, hypertension, proteinuria, and chondritis of pinna, commenting that Plaintiff "has a history of scleritis, proteinuria, relapsing polychondritis and arthralgias," and noting that "dominating fatigability" is associated with these symptoms, and that Plaintiff is "steroid dependent." *Id.* at 000898. According to Dr. Grisanti, based on Plaintiff's symptoms, "particularly his inability to function because of the fatigue, it is difficult [ ] to imagine this man functioning as a physician." *Id.* Dr.

Grisanti recommended Plaintiff pursue early retirement or disability because he was "not optimistic that [Plaintiff's] symptoms will resolve." *Id.*

On May 29, 2014, Plaintiff was evaluated by John H. Stone, M.D. ("Dr. Stone"), Clinical Director of Rheumatology at Massachusetts General Hospital, in connection with Plaintiff's disability benefits application. AR at 000954-958. Based on Plaintiff's documented medical history, records and test results, clinical evaluation of Plaintiff, and Dr. Stone's own clinical experience, Dr. Stone diagnosed Plaintiff with relapsing polychondritis, noting that Plaintiff's "complaints of severe fatigue and pain are reasonable and expected symptoms of his Relapsing Polychondritis." *Id.* at 000955. Dr. Stone opined that Plaintiff's medical condition, including his relapsing polychondritis, the physical manifestations of such condition, and the medical treatment required to control the symptoms rendered Plaintiff "clearly restricted and limited from engaging in the practice of hospital based neurology." *Id.* Accordingly, Dr. Stone found Plaintiff to be "totally disabled from returning to his prior occupation as a hospital based neurologist" and supported Plaintiff's "claim for disability benefits without restriction." *Id.* at 000956.

On June 9, 2014, Plaintiff's attorney, Quiat, timely submitted an appeal of Unum's Initial Denial of Plaintiff's Disability Claim, emphasizing that no one at Unum considered the impact of the fatigue Plaintiff suffered as a result of relapsing polychondritis and the Prednisone Plaintiff injested daily to control the worst symptoms of his underlying illness despite repeated references in the medical records produced by Plaintiff's treating physicians regarding Plaintiff's fatigue. AR at 000865-880. In his Certification accompanying the appeal ("Plaintiff's Certification"), Plaintiff described his

"fatigue levels" as "completely debilitating," adding that he was unable to stand for more than five minutes without holding onto something to avoid falling down, the pain and swelling in his joints made it "extremely difficult to walk," he limped noticeably, and hospital rounds were "both painful and exhausting." *Id.* at 000881-885. Plaintiff understood that his "significantly impaired" productivity was a problem for Hospital administration and was the impetus for the Hospital's decision not to renew Plaintiff's contract. *Id.* According to Plaintiff, by the time his contract was not renewed, the Hospital had asked Plaintiff to continue taking calls at the Hospital as well as covering other area hospitals as an independent contractor, but Plaintiff's physicians were also telling Plaintiff to stop working. *Id.*

On July 9, 2014, in-house Unum physician Beth Schnars, M.D. ("Dr. Schnars"), reviewed Plaintiff's Disability Claim file concluding the medical records did not support Plaintiff's claimed restrictions and limitations as of the date of disability and onward, stating "[o]pinions of impairment are noted to be based on self reports of long standing fatigue without supporting evidence of abnormalities on exam or lab findings and lack of aggressive medical management." AR at 000933-939.

In a telephone call placed on August 7, 2014, Richard A. Enberg ("Enberg") of Unum requested Adrienne Kasbaum ("Kasbaum"), the Hospital's Director of Employee Health Services, provide Unum with the medical questionnaire Plaintiff completed upon accepting employment with the Hospital. AR at 00964. That same day, Kasbaum sent the requested questionnaire to Enberg by facsimile. *Id.* at 000965-973.

On August 15, 2014, Unum requested Alfonso Bello, M.D. ("Dr. Bello"), perform a Medical Record Review of Plaintiff's Disability Claim. AR at 000983-989. Dr. Bello's

assessment of Plaintiff's medical records, provided on September 17, 2014, concurred with the diagnosis of relapsing polychondritis, recurrent scleritis, arthralgias, and fatigue, but in the absence of any evidence of physical limitations based on objective clinical evidence, specifically of abnormal musculoskeletal examination warranting restrictions or limitations, Dr. Bello found Plaintiff was capable of sedentary to light duty work exertion as required for Plaintiff's hospital neurologist job.  AR at 001329-1333.  On October 17, 2014, Unum affirmed the denial of Plaintiff's Disability Claim concluding Plaintiff was able to perform the duties of his occupation.  Id. at 001343-1351 ("Final Denial").  In denying Plaintiff's appeal, Unum differentiated between its reasons for affirming the denial of Plaintiff's Disability Claim, and the SSA's awarding Plaintiff SSDI benefits.  Id. at 001349-1350.  Plaintiff was also advised of his right to commence a legal action under § 502(a) of ERISA.  Id.

On November 19, 2014, Unum submitted additional records for Dr. Bello's review, requesting Dr. Bello indicate whether such information would have any effect on Dr. Bello's earlier determination regarding Plaintiff's ability to work.  AR at 001363-1365.  In his December 5, 2014 Addendum, Dr. Bello specified the additional records included Dr. Orszulak's medical records and a June 11, 2013 note from Dr. Moreland indicating Plaintiff was seen at the rheumatology clinic and was advised to stop working on June 10, 2013.  Id. at 001372.  Neither Dr. Orszulak's medical records nor Dr. Moreland's note provided Dr. Bello with any basis to change his previous medical opinion that Plaintiff remained capable of working.  Id.  By letter dated December 22, 2014, Enberg advised Quiat that Dr. Bello's review of the additional medical records did not change

Dr. Bello's opinion that Plaintiff remained able to work. *Id.* at 001378-1379. This action followed.

## DISCUSSION

**1.    Summary Judgment**

Although Defendant moves for judgment on the administrative record, the Second Circuit has recognized that "[t]he Federal Rules of Civil Procedure do not contemplate such a mechanism." *Flanagan v. First Unum Life Ins.*, 170 Fed.Appx. 182, 184 (2d Cir. Mar. 2, 2006). Rather, "courts treat motions for 'judgment on the administrative record' as motions for summary judgment under Rule 56." *Id.* (quoting *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)). Accordingly, the court considers both Plaintiff's and Defendant's motions as seeking summary judgment.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The court is required to construe the evidence in the light most favorable to the non-moving party. *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322;

*see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

The parties raise similar arguments in support of and in opposition to their respective motions.  Essentially, Defendant maintains that without any objective evidence supporting Plaintiff's subjective claims of fatigue, pain, and inability to meet

the intellectual demands of his hospital neurologist job, the medical record fails to establish Plaintiff is unable to perform the material and substantial duties of his occupation as a hospital neurologist, that the Disability Policy was not required to specifically require such evidence, that Defendant was permitted to give more weight to objective medical evidence than to Plaintiff's subjective complaints, that Defendant was not required to conduct an IME on Plaintiff, and that Plaintiff's receipt of disability benefits under other insurance policies, as well as SSDI benefits, does not establish Plaintiff is disabled under the terms if the Disability Policy.  Plaintiff's argues in opposition to Defendant's Motion and in support of his own motion that Defendant is attempting to rewrite the Disability Policy by requiring objective proof of subjective complaints, including fatigue, pain, and diminished capacity to meet the intellectual demands of his hospital neurologist position, all of which are well-documented, that it is impossible to provide objective proof of subjective complaints, and although the award of disability benefits by Hartford, MetLife and SSDI are not dispositive of whether Plaintiff is disabled under the Disability Policy, such awards are evidence of disability and entitled to considerable weight.  Whether Plaintiff's claim that he is unable to perform any occupation, as defined under the Disability Policy, is properly before the court as it has not been presented to Unum for review and, thus, has not been administratively exhausted is also disputed.  The parties disagree as to whether, if the court determines questions of fact exist regarding Plaintiff's claimed disability, the proper remedy on *de novo* review is remand to Unum for further consideration or a bench trial on the merits as there is no right to a jury trial under ERISA.  *O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011) ("there

is no right to a jury trial in a suit brought to recover ERISA benefits" (citing *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 568 (2d Cir. 1998)). Plaintiff also maintains Unum's investigation of Plaintiff's Claim was unfair and in violation of its fiduciary duties.

**2.    ERISA Standard of Review**

ERISA provides that "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) ("§ 1132(a)(1)(B)"). "In a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." *Lionelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989) (citing § 1132(d)(2)). "ERISA plans are construed according to federal common law," *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002), with the "straightforward language . . . given its natural meaning," *Burnham*, 873 F.2d 489, and ambiguous terms construed against the insurer. *Critchlow v. First UNUM Life Ins. Co. of America*, 378 F.3d 246, 256 (2d Cir. 2004) (citing cases). "Language in a plan 'is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire . . . agreement.'" *Id.* (quoting *Fay*, 287 F.3d at 104).

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), in which case "the denial is subject to arbitrary and capricious review and will be overturned only if it is

without reason, unsupported by substantial evidence or erroneous as a matter of law."

*Thurber v. Aetna Life Ins. Co.*, 712 F.3d 654, 658 (2d Cir. 2013) (quoting *Kintsler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (additional quotation marks and citation omitted)).  Which standard of review applies is critical because "[u]nder the arbitrary and capricious standard of review, we may overturn a decision to deny benefits only if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) (quoting *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)).  Furthermore, "a district court's review under the arbitrary and capricious standard is limited to the administrative record."  *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995).  In contrast, under *de novo* review, the "default standard," the court gives no deference to the administrator's decision, *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 103 (2d Cir. 1991); rather, the district court is authorized to act as the finder of fact.  *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003).  Nor, under a *de novo* review, is any deference given to the plan administrator's interpretation of the plan; rather, the administrator must show the claimant's interpretation of the ERISA plan is unreasonable, and the administrator's interpretation is the only fair interpretation of the policy.  *Brutvan v. CIGNA Life Ins. Co. of New York*, 2013 WL 5439151, at * 4 (S.D.N.Y. Sept. 27, 2013) (citing cases).  Further, the rule of *contra proferentum*, *i.e.*, "'that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter,'" applies only upon *de novo* review of an ERISA

determination.  *Pagan*, 52 F.3d at 443 (quoting *O'Neil v. Retirement Plan For Salaried Employees of RKO General, Inc.*, 37 F.3d 55, 61 (2d Cir. 1994)).

In the instant case, the parties have stipulated to a *de novo* review.  Defendant's Memorandum at 12; Plaintiff's Memorandum at 11.  Plaintiff's claims are thus subject to *de novo* review, for which the critical question for the court on review of an ERISA plan administrator's denial of benefits is not whether the plan administrator's decision was supported by sufficient evidence but, rather, whether "the record reveals a dispute of an issue of material fact."  *O'Hara*, 642 F.3d at 117 (citing *Pucino v. Verizon Wireless Communications, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010)).[10]

### 3.    Evidence Outside the Administrative Record

Plaintiff, in support of his motion, submits in support of his Disability Claim new evidence that is not included in the administrative record, most notably, a January 5, 2016 Reassessment Summary by Dr. Carette assessing Plaintiff with Granulomatosis with polyangiitis ("GPA"), formerly known as Wegener's granulomatosis, a possible diagnosis which was considered for Plaintiff in August 16, 2007 (AR at 000670), and March 18, 2009 (AR at  000590-91).  *See* Rosati Declaration ¶¶ 2-3 and Exhs. 1 (Plaintiff's Expert Witness Disclosure identifying, *inter alia*, Dr. Carette as an expert to testify Plaintiff suffers from granulomatosis with polyangiitis based on ANCA testing positive for cytoplasmic antineutrophilcyroplasmic antibody (c-ANCA) directed against PR3 and consistent with Plaintiff's history of scleritis and renal disease, as well as objective symptoms of fatigue and arthralgias), and 2 (Dr. Carette's Reassessment

---

[10] Plaintiff does not assert Unum, in administering the ERISA plan, failed to comply with any federal regulations, which noncompliance would require de novo review.  *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 57-58 (2d Cir. 2016) (holding that when an ERISA plan administrator fails to comply with the Department of Labor's claims processing regulations, the denial of benefits under the plan is subject to *de novo* review in federal court).

Summaries for examinations on June 30, 2015, and January 5, 2016, with Dr. Carette's impression that Plaintiff's history of sclertitis, polyarthralgia, positive urinalysis suggesting glomerulonephritis, and serology assessment demonstrating positive anti-PR3 "point to ANCA associated vasculitis (Granulomatosis and polyangitiis). . . ."). According to Plaintiff, good cause exists for the court to consider this evidence of his current diagnosis of PGA as it proves Plaintiff is totally disabled. Plaintiff's Memorandum at 1, 11. In opposing the court's consideration of evidence outside the Administrative Record, Defendant argues that Plaintiff has failed to establish good cause for its consideration, as is Plaintiff's burden, has admitted the new evidence is not material to the question of whether Plaintiff is disabled and entitled to benefits but, rather, is intended only to alert the court to facts regarding the case, Defendant's Response at 10-11, that Plaintiff stated during the January 6, 2016 scheduling conference that no discovery beyond the administrative record was necessary, *id.* at 11, and the new evidence was never provided to Defendant for administrative review of Plaintiff's Disability Claim. *Id.* In further support of summary judgment, Plaintiff argues "a new diagnosis is good cause to consider new evidence." Plaintiff's Reply ¶ 17.

"A district court reviewing a denial of benefits de novo may consider evidence outside the administrative record if it finds 'good cause' to do so." *Sanford v. TIAA-CREF Individual & Institutional Services, Inc.*,612 Fed.Appx. 17, 19 (2d Cir. Apr. 27, 2015) (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003)); *DeFelice v. American International Life Assurance Company of New York*, 112 F.3d 61, 67 (2d Cir. 1997) (the district court's "review 'is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional

evidence.'"). "The doctrine limiting review of ERISA claims to evidence before the plan administrator was developed to prevent federal courts from becoming 'substitute plan administrators' and thus to serve ERISA's purpose of providing a method for workers and beneficiaries to resolve their disputes over benefits inexpensively and expeditiously." *Daniel v. UnumProvident Corp.*, 261 Fed.Appx. 316, 318 (2d Cir. Jan. 4, 2008) (internal quotation marks and citations omitted). Relevantly, "the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause.'" *Halo v. Yale Health Plan, Director of Benefits & Records Yale University*, 819 F.3d 42, 60 (2d Cir. 2016) (quoting *DeFelice v. Am. Int'l Life Assurance Co.*, 112 F.3d 61, 66-67 (2d Cir. 1997)). Good cause warranting the introduction of additional evidence includes "'[a] demonstrated conflict of interest in the administrative reviewing body,'" *id.* (quoting *DeFelice*, 112 F.3d at 67), as well as circumstances in which introduction is sought for a medical report where "it was highly probative and written by a disinterested party who had actually examined [the plaintiff]" and it was not the plaintiff's fault that the report initially was absent from the administrative record. *Id.* (quoting *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006)). "[T]he plaintiff need not demonstrate that the conflict caused [ ] actual prejudice in order for the court to consider the conflict to be 'good cause.'" *DeFelice*, 112 F.3d at 67. "[U]pon *de novo* review, even purely factual interpretation cases may provide a district court with good cause to exercise its discretion to admit evidence not available at the administrative level if the administrator was not disinterested." *DeFelice*, 112 F.3d at 66.

Here, it strains credulity that Unum, as Provident's corporate parent, at least with regard to the financial realities of its wholly-owned subsidiary, is anything other than not an entity disinterested in Provident, thus demonstrating a conflict of interest.[11]  *See Paese*, 449 F.3d at 441 (plan administrator not disinterested when same as insurer).  A finding that Unum and Provident are not disinterested entities would be consistent with the Disability Policy's definition of "We, Our, and Us" as referring to Provident "and its affiliates," Disability Policy at 000022, without differentiating between Provident and Unum.  The parties, however, have not addressed the issue and, as such, Plaintiff has not met his burden to prove "that the conflict of interest affected the administrator's decision."  *Whitney v. Empire Blue Cross and Blue Shield*, 106 F.3d 475, 477 (2d Cir. 1997).  Nevertheless, a "demonstrated conflict of interest in the administrative reviewing body is [only one] example of "good cause' warranting the introduction of additional evidence," *DeFelice*, 112 F.3d at 67, and the "normal scope" of *de novo* review, *i.e.*, limited to the administrative record before the plan administrator, "is inappropriate where the fairness of the ERISA appeals process cannot be established using only the record before the administrator."  *Id.* at 66.  Furthermore, a retrospective diagnosis has been held to be "not invalid simply because it is retrospective," and relevant to an ERISA disability determination where the diagnosis is made by a treating physician "to the extent that it is predicated on medically accepted technique," and the retrospective diagnosis's accuracy is subject to consideration of contradictory evidence in the

---

[11] The mere fact that a parent corporation has a financial interest in its wholly-owned subsidiary corporation is not necessarily sufficient to pierce the corporate veil so as to hold the parent corporation liable for the actions of the subsidiary corporation.  *See Broadvision Inc. v. General Electric Co.*, 2009 WL 1392059, at * 4 (S.D.N.Y. May 5, 2009) (holding parent corporation's direct financial interest in its subsidiary, without more, is insufficient to hold the parent corporation liable for the actions of its subsidiary (citing cases)).

administrative record.  *Tritt v. Automatic Data Processing, Inc. Long Term Disability Plan*, 2012 WL 3309380, at * 10 (D.Conn. Aug. 13, 2012).

In *Tritt*, the court drew an analogy between the regulatory schemes of the SSA and ERISA, asserting that "[t]he 'treating physician rule' does not apply to claims under ERISA; but it is still relevant that in a Social Security case, 'a retrospective medical diagnosis by a treating physician is entitled to controlling weight when no medical opinion in evidence contradicts a doctor's retrospective diagnosis finding a disability,'" *Tritt*, 2012 WI 3309380, at * 10 (quoting *Roy v. Apfel*, 201 F.3d 432; 1999 WL 1295361, at * 3 (2d Cir. Dec. 2, 1999) (unpublished)), continuing that "[w]ere retrospective diagnoses categorically invalid, this application of the treating physician rule would be nonsensical."  Although it is settled that Social Security concepts are not to be imported into ERISA, *see Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 115 & n. 7 (2d Cir. 2014) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830-32 (2003) (holding lower court "erred in equating the two statutory regimes" when it imported in the ERISA context the 'treating physician rule' contained in the Social Security regulations)), the reasoning applied by the court in *Tritt* in finding a treating physician's retrospective diagnosis applies equally to disability claims brought under ERISA.  In particular, "'[a] diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment.  Such a diagnosis must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of a physical impairment prior to [the administrator's decision].'"  *Id.* (quoting *Dousewicz v. Harris*,

646 F.2d 771, 774 (2d Cir. 1981) (bracketed text added; further internal citation and quotation marks omitted).

In the instant case, Dr. Carette's post-appeal submission to challenge Unum's substantive determination was not before Unum when Unum made its decision, and does not speak to Unum's potential for a biased assessment. *See Correia v. Unum Life Insurance Company of America*, 2016 WL 5462827, at * 26 (S.D.N.Y. Sept. 29, 2016) (refusing to consider evidence submitted by plaintiff's psychologist, dated after defendant insurance company claim administrator's denial on administrative appeal of plaintiff's long-term disability insurance benefits claim because fact that such evidence was not before claims administrator on administrative appeal established the new evidence was irrelevant to administrator's potential for biased assessment), *appeal filed* October 28, 2016.  Nevertheless, Dr. Carette's retrospective diagnosis is based upon objective medical testing and physical examination of Plaintiff and, moreover, consistent with Plaintiff's self-reported subjective complaints.  Further, as Plaintiff points out, *see* Rosati Declaration ¶¶ 2-3, the PGA diagnosis was considered on August 16, 2007 (AR at 000670), and March 18, 2009 (AR at  000590-91), such that the diagnosis is not something that Defendant was completely without any basis to consider.  Under these circumstances, because the medical records of Dr. Carette which Plaintiff seeks to submit are highly probative of Plaintiff's disabling condition, particularly Plaintiff's objective complaints of pain and fatigue, the court finds Plaintiff has established good cause to consider the newly submitted evidence.

3.    **Merits of Claims**

It is settled that Plaintiff has the burden of proving he is disabled under the terms of the Disability Policy.  *Paese*, 449 F.3d at 441 (citing *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002)).  Because "there is no right to a jury trial in a suit brought to recover ERISA benefits, and thus the district court would have been the factfinder at trial, the district court's task on a summary judgment motion – even in a nonjury case – is to determine whether genuine issues exist for trial, not to make findings of fact."  *O'Hara*, 642 F.3d at 116 (citing *Tischmann*, 145 F.3d at 568).  It is, however, only where the parties consent to a bench trial on the parties' submissions, stipulating to the administrative record and waiving the right to call witnesses, that the district court may "'make explicit findings of fact and conclusions of law' pursuant to Federal Rule of Civil Procedure 52(a)."  *Id.* (quoting *Muller*, 341 F.3d at 124).  Here, because the parties have not stipulated to a "'summary trial' or a "bench trial 'on the papers,' . . . the district court [is] obliged to proceed in traditional summary judgment fashion."  *Id.*  Simply put, the court "must determine whether [Plaintiff] presented evidence from which a reasonable factfinder could conclude that she was disabled within the meaning of the [Disability Policy]."  *Id.* at 119 (citing cases).  Further, applying a *de novo* standard of review, the court gives no deference to the administrator's decision, *O'Hara*, 642 F.3d at 116; *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 103 (2d Cir. 1991); and does not determine whether the administrator's decision was supported by sufficient evidence but instead decides only whether there exists a genuine issue of material fact requiring trial.  *O'Hara*, 642 F.3d at 117.

Preliminarily, the court addresses Plaintiff's assertion that Plaintiff's physicians' opinions that Plaintiff is unable to work are consistent with the SSA's determination that Plaintiff was disabled from performing any employment within the national economy, which is decidedly a more narrow determination than that necessary for disability under the Disability Policy's requirement that Plaintiff be unable to perform his usual occupation, thus establishing that Plaintiff should also be found disabled under the Disability Policy.  Plaintiff's Memorandum at 15-16.  In opposing this argument, Defendant not only argues the SSA's favorable determination is not controlling as to the administrator's decision to grant or deny benefits, but also maintains that the SSDI award is insufficient to establish Plaintiff's entitlement to benefits under the Disability Policy because the SSA's decision did not include a review by a physician, in contrast to Defendant's having a rheumatologist conduct an independent medical review of Plaintiff's updated file in September 2014, which review does not support a finding of disability, and the SSA's disability decision is erroneous.  Defendant's Memorandum at 14-15; Defendant's Response at 14-15.  In further support of summary judgment, Plaintiff argues that the SSA's awarding Plaintiff SSDI benefits is corroborating evidence that Plaintiff is disabled not only as to his most recent occupation as a hospital neurologist, but also as to any occupation in the national economy, and Defendant's own claims manual requires the SSA's decision be given "significant weight."  Plaintiff's Reply ¶ 21 (citing AR at 000929 (attorney-client privilege consultation in which Nancy M. Smith ("Smith"), on June 24, 2014, responds to Enberg's June 17, 2014 inquiry that the relevant claims manual[12] provides Unum must give "significant weight" to the SSA's decision awarding Plaintiff SSDI benefits)).

_____

[12] Although no copy of the claims manual is in the record, Defendant has not directly disputed that the

While SSA awards may be considered when determining whether a claimant is disabled, a plan administrator is not bound by the award and is not required to accord that determination any 'special deference.'"  *Testa v. Hartford Life Ins. Co.*, 483 Fed.Appx. 595, 598 (2d Cir. 2012) (quoting *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010)).  Accordingly, the SSA's determination that Plaintiff's medical condition renders him eligible for SSDI benefits is not entitled to any special deference on summary judgment.  This is so because ERISA, unlike the SSA, does not have the "treating physician's rule" requiring controlling weight be given to the opinion of a benefit claimant's treating physician.[13]  *See Suarato v. Building Services 32BJ Pension Fund*, 554 F.Supp.2d 399, 435 n. 35 (S.D.N.Y. 2008) (citing *Pagan v. NYNEX Pension Plan*, 846 F.Supp. 19, 21 (S.D.N.Y. 1994), *aff'd*, 52 F.3d 438 (2d Cir. 1995), and explaining "because the Social Security Administration has a 'treating physician's rule,' and ERISA-governed private pension plans do not, it is not very surprising that a claimant could qualify for Social Security disability benefits, but in the plan's administrator's discretion be denied private disability benefits on the same administrative record.").

"The Second Circuit 'encourages plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion,' but it does not require that an administrator do so."

___

claims manual provides as indicated by Smith in responding to Enberg on June 24, 2014.  *See* Defendant's Response Statement of Facts ¶ 72 (denying Plaintiff's assertion "to the extent that it omits and/or misquotes the full and complete context of the administrative record and/or mischaracterizes the information contained therein," but, with regard to AR at 000929, "admit[ting] that the administrative record contains claim notes, which speak for themselves.").

[13] Under the "treating physician rule," the SSA must give controlling weight to a treating physician's opinion as to the nature and severity of a claimant's impairment where such opinion "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2).

*Wedge v. Shawmut Design and Const. Group Long Term Disability Insurance Plan*, 23

F.Supp.3d 320, 344 (S.D.N.Y. 2014) (quoting *Hobson v. Metropolitan Life Ins. Co.*, 574

F.3d 75, 92 (2d Cir. 2009) (ERISA plan administrator's explanation for reason claimant

was determined not disabled for purposes of long-term disability benefits under ERISA

despite the SSA's opposite conclusion "furthers ERISA's goal of providing claimants

with additional information to help them protect their claims for subsequent appeals.")).

In the instant case, Unum, in initially denying Plaintiff's Disability Claim, did not explain

its reasons for reaching a different conclusion than the SSA did in granting Plaintiff

SSDI benefits, AR at 000804-810, nor could Unum have done so given Plaintiff was not

awarded SSDI until January 11, 2014, AR at 000900-903, after Unum's initial denial.

Nevertheless, in affirming the denial on appeal, Unum explains that the SSA's decision

did not include a review by a physician, the SSA's disability determination is

inconsistent with the medical evidence, evidence subsequent to the SSA's November

2013 determination was not considered and is not supportive of disability, Unum had a

rheumatologist conduct an independent medical review of Plaintiff's updated file which

did not support finding a disability, and because no physician medical review was done,

Unum was permitted to rely on the comprehensive medical reviews by its physicians

and specialty medical examiner, which evidence is compelling in supporting Plaintiff's

work capacity.  AR at 001349-1350.   Unum's compliance with the Second Circuit's

encouragement to explain its reasons for determining Plaintiff is not disabled in light of

the SSA's opposite conclusion, however, does not render irrelevant the SSA's

determination that Plaintiff is unable to perform any work.  Rather, at a bench trial, the

court, although not bound by the SSA's decision awarding Plaintiff SSDI, should give

the SSA's decision "significant weight," as required under the Disability Policy. Similarly, although the court is not bound by the decisions by Plaintiff's other insurers, Hartford and MetLife, awarding Plaintiff long-term disability benefits, *see Kocsis v. Standard Ins. Co.*, 142 F.Supp.2d 241, 252-53 (D.Conn. 2001) (recognizing findings by SSA and other insurers that plaintiff is totally disabled are not binding on court reviewing administrative decision that was based on a different insurance plan with different definitions and provisions for disability determination), such facts may be considered at a bench trial. *See Frischman v. Fleming*, 193 F.Supp. 619, 624 (E.D.N.Y. 1961) (evidence, including expert opinions of various physicians whose reports were included in administrative record, could be considered by, but were not binding on, insurer).

With regard to the opinions of Plaintiff's treating physicians, "the Supreme Court has explicitly stated that, unlike SSA, ERISA Plan administrators need not give special deference to a claimant's treating physician." *Paese*, 449 F.3d at 442 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). Nevertheless, an ERISA plan administrator "'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.'" *Id*. As such, although no special deference to a treating physician's opinion is required, "this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these

opinions reliable and probative." *Paese*, 449 F.3d at 442. Thus, the evaluations of Plaintiff's treating physicians may be considered on Defendant's motion.

In particular, a thorough review of the record establishes genuine questions of material fact exist as to whether Defendant's denial of Plaintiff's disability application is supported by the Administrative Record. Plaintiff's disabling condition is not premised on any specific diagnosis but, rather, on Plaintiff's consistent assertion that his medical condition, diagnosed at the time he ceased working on June 10, 2013 as relapsing or recurrent polychondritis with polyarthralgias, and most recently diagnosed as PGA, causes him profound fatigue such that Plaintiff was unable to make his hospital rounds as a neurologist. Plaintiff's Memorandum at 8. Plaintiff's treating physicians, including Dr. Moreland and Dr. Rajarantha, concurred with Plaintiff's complaints of fatigue, sharing with Dr. Bress that it was the fatigue that rendered Plaintiff unable to work. AR at 000742 (Dr. Moreland explaining that as a rheumatologist, he had "experienced many patients who suffer with autoimmune disease resulting in significant fatigue and other symptoms," not all of which "are verifiable by objective evidence though they are no less real or debilitating"), and 000757 (Dr. Rajarantha reporting Plaintiff "doesn't have any physical strength to maintain any function," "is unable to maintain any position in any length of time without pain," and Plaintiff's "mental situation is greatly affected by his disability"). The assessment of Dr. Stone, a rheumatologist, after examining Plaintiff on May 29, 2014, is consistent with the findings of Drs. Moreland and Rajarantha, including that Plaintiff's documented medical history, records and test results, clinical evaluation of Plaintiff, and Dr. Stone's own clinical experience supported the relapsing polychondritis diagnosis, noting that Plaintiff's "complaints of severe fatigue and pain

are reasonable and expected symptoms of his Relapsing Polychondritis," and the physical manifestations of such condition and the medical treatment required to control the symptoms rendered Plaintiff "clearly restricted and limited from engaging in the practice of hospital based neurology," such that Plaintiff was "totally disabled from returning to his prior occupation as a hospital based neurologist," and Dr. Stone supported Plaintiff's "claim for disability benefits without restriction." *Id.* at 000954-000958. Significantly, nothing in the Administrative Record indicates any physician who examined or treated Plaintiff questioned the sincerity or severity of Plaintiff's claimed disabling fatigue.

It is also significant that in neither Unum's initial determination of December 11, 2013, or final decision after administrative appeal on October 17, 2014, did Unum specifically address Plaintiff's chief complaints of severe fatigue which Plaintiff claims interfered with Plaintiff's ability to perform his hospital neurologist job, including Plaintiff's ability to complete rounds which required Plaintiff to ambulate about the hospital, standing and walking while conferring with patients and other medical care providers, as well as with Plaintiff's mental acumen, especially when Plaintiff was on call and expected to be available to work 24 hours a day for seven straight days. Nor does the Disability Policy require that Plaintiff present proof of any specific diagnosis to substantiate his subjective, self-reported complaints. *See Dimopoulou v. First Unum Life Insurance Company*, 162 F.Supp.3d 250, 259 (S.D.N.Y. 2016) (holding ERISA plan administrator erred in failing to analyze whether the plaintiff's actual symptoms, as opposed to her diagnoses, satisfied the disability plan's definition of a disability as occurring when "[y]ou are limited from performing the material and substantial duties of

your regular occupation due to any sickness or injury . . . ," thus defining "'disability' not in terms of satisfaction of specific diagnostic criteria, but rather in terms of the performance limits one faces in her occupation due to any sickness or injury."). Similarly, in the instant case, "disability" is defined as "You are not able to perform the material and substantial duties of Your Occupation. . . ."  Disability Policy at 000022. Further, the Disability Policy's only provision regarding proof of disability provides "[w]e can require any proof that We consider necessary to consider Your claim.  This may include medical information, personal and business tax returns filed with the Internal Revenue Service, financial statements, accountant's statements or other proof acceptable to us."  Disability Policy at 000023.  Unum, however, in denying Plaintiff's Disability Claim, failed to advise Plaintiff what proof Unum considered necessary to substantiate his claimed disability. *See Juliano v. Health Maintenance Organization of New Jersey, Inc.*, 221 F.3d 279, 287 (2d Cir. 2000) (requiring that a denial of benefits under ERISA provide a claimant with enough information to adequately prepare for full and fair further administrative review or review in federal court).  In fact, both the Initial Decision and the Final Decision are completely devoid of any discussion of Plaintiff's assertion that the extreme fatigue from which he suffered interfered with Plaintiff's mental acumen, thus rendering it impossible for Plaintiff to perform the mental aspects of his hospital neurologist position.

Insofar as Unum relied, in denying Plaintiff's Disability Claim, on Dr. Moreland's statements during the October 16, 2013, telephone conversation between Dr. Bress and Dr. Moreland, in which Dr. Moreland concurred with Dr. Bress's assessment that Plaintiff's medical records showed Plaintiff's examination findings and laboratory tests

were normal, and that Plaintiff claimed to be unable to work based on fatigue, AR at

569-70, Dr. Bress's characterization in the October 16, 2013 Letter to Dr. Moreland

recapitulating the conversation, including that "Dr. Moreland stated that he is not

supporting any restrictions or limitations," and that Plaintiff reported being unable to

work because of fatigue which was not supported by Plaintiff's medical examinations

and laboratory findings, *id.* at 000572-73, was directly contradicted by Dr. Moreland.

Specifically, in a letter dated October 20, 2013, Dr. Moreland corrected Dr. Bress's

assessment of the October 16, 2013 telephone call, asserting that as a rheumatologist,

Dr. Moreland was familiar with autoimmune diseases, for which patients often report

fatigue is a "major problem," although "[t]here is no blood test or approved questionnaire

that accurately measures fatigue," with patients often having "normal lab (routine) and

exams." *Id.* at 000618-619.  Accordingly, in contrast to Defendant's argument,

Defendant's Memorandum at 6-7, 13, although Dr. Moreland did not place any work

restrictions on Plaintiff based on Plaintiff's laboratory test results and physical

examinations, Dr. Moreland was not questioning Plaintiff's report that he was unable to

function as a hospital neurologist and supported Plaintiff's claim for disability.  *Id.*

Plaintiff's consistent complaints of severe fatigue, joint pain, and mental confusion

corroborate the Hospital's decision not to renew Plaintiff's contract because Plaintiff was

not seeing enough patients on a daily basis to cover the costs of Plaintiff's hospital

neurologist position, and that the Hospital also expressed an interest in having Plaintiff

continue to work as a hospital neurologist, albeit as an independent contractor, is

consistent with a finding that the quality of Plaintiff's work, when able to perform it, did

not factor into the Hospital's decision not to renew Plaintiff's contract.  *See* AR at

000881-885 (Plaintiff's Certification in support of administrative appeal that Plaintiff understood his "significantly impaired" productivity was a problem for Hospital administration and was the impetus for the Hospital's decision not to renew Plaintiff's contract but, rather, asked Plaintiff to continue taking calls at the Hospital and to cover other area hospitals as an independent contractor, an offer Plaintiff declined because his physicians had told Plaintiff to stop working).[14]  As such, Defendant's assertion that Dr. Moreland admitted Plaintiff was not disabled, Defendant's Memorandum at 13, is less than genuine.

Defendant's reliance on Nichol's statement that she was "very suspect" of Plaintiff's Disability Claim because Plaintiff never mentioned "any medical history" in the pre-employment questionnaire, Defendant's Reply at 6-7, is without any merit because it ignores that Plaintiff disclosed on a Baseline Health Assessment completed on September 12, 2011, he had been diagnosed with rheumatism, arthritis, high blood pressure, and diabetes, and had a history of sciatica, was in good health and had experienced pain in his joints for two years, and his medications included Metoprolol for high blood pressure, insulin for diabetes, and Prednisone for arthritis.[15]  *Id.* at 000968-000971.  Plaintiff maintains when he accepted the employment offer for the hospital neurologist position at the Hospital, Plaintiff believed the relapsing chondritis diagnosis was only one of several that had then been considered, Plaintiff's Response at 2-3, suggesting Plaintiff did not believe the diagnosis was conclusive.

---

[14] That Plaintiff completed extensive medical training and practiced as a physician since 1992 before seeking disability, AR at 000881-885, is evidence the court may considers as to Plaintiff's credibility.  *See Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 487 (2d Cir. 2013) (observing the plaintiff's "long history of hard work supports his credibility on this issue [of disability].").

[15] Plaintiff has not challenged the only evidence of this telephone conversation, *i.e.*, July 30, 2013 file note in which Robinson memorializes the putative telephone conversation with Nichols, AR at 000235, as hearsay.

Considering the Administrative Record in its entirety thus establishes there are unresolved issues of material facts regarding Plaintiff's ability to perform his hospital neurologist job requiring bench trial.

### 4.    "Claims" Against Unum

Plaintiff claims Unum's investigation of Plaintiff's Disability Claim was "unfair and in violation of its fiduciary duties," because records that Defendant initially withheld from Plaintiff as attorney-client privilege protected documents, and which were later produced, "show Unum was never interested in fairly assessing this claim . . . ." Plaintiff's Memorandum at 13-14.  According to Plaintiff, such records establish Enberg sought legal advice solely to defeat, rather than to evaluate, the Disability Claim, including conducting an extensive, albeit fruitless, fraud investigation,[16] requesting information from the Hospital to demonstrate Plaintiff was not disabled, never requesting an IME, and continuing to solicit new evidence to bolster Unum's decision on administrative appeal that Plaintiff is not disabled.  *Id.* at 14-15.  Defendant has not responded to this argument.

Although either the plan or the administrator is a proper defendant to an ERISA action, *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, (2d Cir. 2002) (reiterating both plans and plan administrators are proper defendants in action seeking recovery of benefits under an ERISA plan), in the instant case, Plaintiff has sued only the plan, Provident, but has not sued Unum, the Plan Administrator.

---

[16] Insofar as Plaintiff's assertions regarding the fraud investigation conducted with regard to his Disability Claim could be construed as challenging the legality of such investigation, the court notes that district courts within the Second Circuit recognize "'surveillance is an acceptable way to help evaluate a claimant's entitlement to disability benefits.'"  *DeCesare v. Aetna Life Ins. Co.*, 95 F.Supp.3d 458, 485 (S.D.N.Y. 2015) (quoting *Burgio v. Prudential Ins. Co. of America*, 2011 WL 4532482, at * 6 (E.D.N.Y. Sept. 26, 2011) (collecting cases approving of ERISA plan's consideration of surveillance in assessing plaintiffs' disability claims)).

Neither party has discussed the exact relationship between Defendant and Unum,

especially, as relevant here, whether Unum's actions in administering the Disability Plan

were sufficiently connected to Defendant so as to render Unum an alter ego of

Defendant, thereby allowing for claims against Unum to be lodged against Defendant.

*See S.M. v. Oxford Health Plans (N.Y.)*, 644 Fed.Appx. 81, 85 (2d Cir. Mar. 25, 2016)

(holding that because "'a parent corporation and its subsidiary are regarded as legally

distinct entities and a contract under the corporate name of one is not treated as that of

both,'" the district court's dismissal, from ERISA disability benefits action, of defendants

who were wholly owned subsidiaries of ERISA plan administrator was proper where the

plaintiff alleged no wrongdoing by the other defendant, was not in privity with them, and

offered no reason to pierce the corporate veil so as to attribute any conduct by the

insured to the subsidiaries (quoting *Carte Blanche (Sing.) Pte., Ltd. v. Diners Club Int'l,

Inc.*, 2 F.3d 24, 26 (2d Cir. 1993))), *cert. denied*, __ U.S. __; 137 S.Ct. 148 (2016).

Accordingly, the court should not consider any of Plaintiff's arguments that suggest a

claim against Unum.

## 5.    Whether to Remand to Administrator

Defendant maintains that, should the court determine the denial of Plaintiff's

Disability Claim was improper under the terms and conditions of the Disability Policy,

the appropriate judgment would not be summary judgment in Plaintiff's favor but, rather,

remand for Unum's further consideration of the claim, Defendant's Response Statement

of Facts at 1-2, an assertion opposed by Plaintiff who maintains that upon *de novo*

review, the court determines whether Plaintiff is entitled to benefits under the Disability

Policy without any deference to Defendant's previous determination.  Plaintiff's Reply ¶ 2.

The Second Circuit has not addressed this issue, and there is a divergence of opinion among the circuit courts that have.  *See Sarosy v. Metropolitan Life Insurance Company*, 1996 WL 426387, at * 8 (S.D.N.Y. July 30, 1996) (comparing opinions of various circuit courts of appeal to demonstrate lack of consensus on matter).  Nevertheless, this court has considered remand to the administrator more appropriate when review is under the arbitrary-and-capricious standard than, as here, under *de novo* review in which case the court need not give any deference to the plan administrator's finding but, instead, can resolve disputed issued of fact at a bench trial.  *Macmillan v. Provident Mutual Life Ins. Co. of Philadelphia*, 32 F.Supp.2d 600, 616 (W.D.N.Y. 1999).  Accordingly, in the instant case, remand to the plan administrator is unnecessary, and the matter should be scheduled for a bench trial before the District Judge or, upon the parties' consent pursuant to 28 U.S.C. § 636(c), before the undersigned.

## 6.    Unexhausted Claim

Defendant maintains the court is without jurisdiction to grant Plaintiff permanent, long-term benefits under the "any occupation" standard because Plaintiff has not presented such claim to Unum for consideration and, thus, has not exhausted administrative remedies as to the claim asserting the court, if it determines Plaintiff's Disability Claim was not properly considered, should provide Defendant with an opportunity to consider whether Plaintiff is entitled to long-term disability benefits under the any occupation standard before rendering any judicial opinion on the matter.

Defendant's Response at 16-17.  In anticipation of this argument, Plaintiff acknowledges the Second Circuit has never reached the issue, but urges this court to follow the other circuit courts that have considered the issue and decided against requiring remand to the plan administrator for consideration of long-term disability from any occupation. Plaintiff's Memorandum at 24-25.

The Second Circuit has held that Plaintiff's failure to exhaust administrative remedies under ERISA with regard to the claim is not a jurisdictional defect but, rather, an affirmative defense.  *Paese v. Hartford Life and Accident Insurance Company*, 449 F.3d 435, 446 (2d Cir. 2006).  Here, it is undisputed that Defendant knew upon receiving Plaintiff's long-term benefits application that Plaintiff was seeking disability benefits under the Disability Policy until age 67, at which time the benefits under the Disability Policy cease, Disability Policy at 000008, yet failed to raise in its answer Plaintiff's failure to administratively exhaust Plaintiff's claim for permanent, long-term benefits under the "any occupation" standard.  *See* Answer (asserting three other affirmative defenses).  Nevertheless, Plaintiff has also failed to raise Defendant's waiver of the failure to exhaust administrative remedies affirmative defense and, as such, has likewise waived the argument.  *See Lanham v. Mansfield*, 400 Fed.Appx. 609, 611 (2d Cir. Nov. 24, 2010) (Plaintiff, by failing to raise in opposition to summary judgment, Defendant's failure to raise as an affirmative defense in its answer Plaintiff's failure to exhaust administrative remedies, waived such ground on which to oppose summary judgment) .  Although Defendant, by failing to raise this affirmative defense until moving for summary judgment, could waive the right to assert it, *see Harris v. Higley*, 2009 WL 185989, at * 9 (W.D.N.Y. Jan. 26, 2009) (holding failure to exhaust administrative

remedies waived where not raised in answer, but first asserted on summary judgment (citing cases)), Plaintiff has not so argued and "there is a 'firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases.'" *Jones v. UNUM Life Ins. Co. of America*, 223 F.3d 130, 140 (2d Cir. 2000) (quoting *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993), and holding that because the plan administrator had yet to make a determination as to a post-24-month period of benefits based on the plaintiff's ability to perform "any occupation," there was not yet a case or controversy on the issue as the plaintiff had yet to suffer any actual or threatened injury. As such, "absent a 'clear and positive showing' that seeking review by the carrier would be futile, that remedy must be exhausted prior to the institution of litigation." *Id.* (quoting *Kennedy*, 989 F.2d at 595). *See Peterson v. Continental Casualty Co.*, 282 F.3d 112, 117 (2d Cir. 2002) (reversing district court's order determining under ERISA plaintiff's eligibility for permanent disability benefits where ERISA benefits plan administrator had not made any such determination, the matter before the administrator having been limited to plaintiff's claim for short-term disability benefits, such that issue of permanent disability benefits was not ripe for determination).

Accordingly, Plaintiff's request for summary judgment should be DENIED without prejudice as to the unexhausted "any occupation" claim.

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's Motion (Dkt. 23) should be DENIED;

Plaintiff's Motion (Dkt. 25) should be DENIED.  The matter should be scheduled for a

bench trial before the District Judge.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:  May 2, 2017
     Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        May 2, 2017
                     Buffalo, New York