UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FAROOQ KHAN, M.D.,

           Plaintiff,

   -vs-

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY,

           Defendant.
_____

**DECISION AND ORDER**
**No. 1:15-cv-00811(MAT)(LGF)**

## I.   Introduction

Farooq Khan, M.D. ("Plaintiff"), represented by counsel, commenced this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA"), asserting a claim for declaratory relief requiring Provident Life and Accident Insurance Company ("Defendant") to pay long-term disability benefits to him under the terms of an employer-sponsored individual disability insurance policy ("the Disability Policy"). The case comes before the Court upon the Report and Recommendation ("the R&R") (Docket No. 33) of United States Magistrate Judge Leslie G. Foschio, issued May 2, 2017, regarding Defendant's Motion for Judgment on the Administrative Record (Docket No. 23) and Plaintiff's Motion for Summary Judgment/Alternative Motion for Judgment Pursuant to Fed. R. Civ. P. 52 (Docket No. 25, superseding Docket No. 23). The R&R recommended that both motions be denied and

that the matter be scheduled for a plenary bench trial before the assigned district judge. <u>See</u> R&R at 3, 57.

The case was transferred to the undersigned on October 24, 2018 (Docket No. 49). On April 5, 2019, the Court issued an Order (Docket No. 51) finding that the parties had effectively stipulated to having this Court conduct a bench trial based solely on their submissions, in which the Court would make explicit findings of fact and conclusions of law. <u>See</u> Order at 2 (citing <u>O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA</u>, 642 F.3d 110, 116 (2d Cir. 2011)). The parties were directed to notify the Court in writing confirming that they consented to the Court proceeding as outlined in <u>O'Hara</u>. <u>Id.</u> at 3-4. The Court timely received both parties' consent. <u>See</u> Text Order (Docket No. 52).

For the reasons discussed below, the Court rejects in part and accepts in part the R&R; grants Plaintiff's Motion for Summary Judgment/Alternative Motion for Judgment Pursuant to Fed. R. Civ. P. 52; denies Defendant's Motion for Judgment on the Administrative Record; and awards long-term benefits to Plaintiff under the "Your Occupation" and "Any Occupation" provisions of the Disability Policy.

## FED. R. CIV. P. 52

"In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). These factual findings

and conclusions "may appear in an opinion or a memorandum of decision filed by the court." Id. A district court's "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the . . . court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). "[C]onclusions of law and mixed questions," on the other hand, "are reviewed de novo." Connors v. Connecticut Gen. Life Ins. Co., 272 F.3d 127, 135 (2d Cir. 2001) (citing LoPresti v. Terwilliger, 126 F.3d 34, 39 (2d Cir. 1997)).

### FINDINGS OF FACT

The following section constitutes the Court's findings of fact, pursuant to Fed. R. Civ. P. 52(a)(1). The findings of fact are drawn from the Administrative Record.[1] "To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa." Barbu v. Life Ins. Co. of N. Am., 35 F. Supp.3d 274, 280 (E.D.N.Y. 2014).

### I. Plaintiff's Medical History

Plaintiff is a board-certified neurologist with a number of medical issues dating back to at least 2005. Because Plaintiff

---

[1] The Administrative Record is contained on a compact disc which was filed under seal at Docket No. 22 on July 27, 2016. The Administrative Record consists of six PDF files which contains a unique Bates number identifier. Specific portions of the Administrative Record are cited to and identified by the Bates identifiers located in the bottom right-hand corner of each page within the PDF files. See also Defendant's Memorandum of Law (Docket No. 23-2) at 2 n. 2 (explaining Bates identifiers used).

continued to submit additional medical evidence during his appeal, the records cover a period extending into mid-2014. During that time, Plaintiff was examined in person and treated by at least twelve physicians, seven of whom were specialists in rheumatology: Drs. Frank Lipson, Yan Liu, Simon Carette, Larry Moreland, Ernesto Levy, Joseph Grisanti, and John Stone. No treating provider whose records are contained in the Administrative Record concluded that Plaintiff was capable of continuing to work as a neurologist.

## A. 2005 Records

On January 17, 2005, Plaintiff saw nephrologist Dr. George Wu for symptoms of proteinuria. He had "significant general fatigue" and right knee arthralgia without inflammation. Dr. Wu requested repeat serology regarding Plaintiff's renal function and complement levels. PLA-CL-IDI-000700.

Plaintiff underwent a whole body bone scan on August 24, 2005, at the request of rheumatologist Dr. Frank Lipson. There are a few handwritten treatment notes from Dr. Lipson in the record, but they are very difficult to read. The radiologist saw "unusual" bone uptake about the proximal tibiae and increased tracer accumulation in multiple small and large joints, which was "striking and may reflect a polyarthropathy." PLA-CL-IDI-000476. An MRI was advised but apparently never performed.

Plaintiff returned to see Dr. Wu on August 26, 2005, regarding his proteinuria. Dr. Wu noted Plaintiff's history of arthralgia in

the knee area. Though the bone scan performed several days before showed increased bone uptake at the tibial-fibular junction, there was no definitive diagnosis of a rheumatological issue. Dr. Wu ordered a battery of renal tests. PLA-CL-IDI-000691-692.

**B.  2006 Records**

At a February 8, 2006 visit with Dr. Wu, Plaintiff complained of arthralgia, particularly in the right knee. Plaintiff had no active joints or effusions. PLA-CL-IDI-000683-684. Dr. Wu requested additional testing in regard to Plaintiff's proteinuria. Id.

On October 16, 2006, Plaintiff followed up with Dr. Wu for his proteinuria. PLA-CL-IDI-000678-679. Dr. Wu reported that in the last year, Plaintiff had had symptoms of fatigue, malaise, paresthesia and polyarthralgia. That day, Plaintiff had a red left eye, as his scleritis was active. Dr. Wu noted that scleritis can be associated with Wegener's granulomatosis, polyarteritis nodosa, collagen vascular disease such as rheumatoid arthritis, and granulomatous disease such as sarcoidosis. Dr. Wu requested repeat serological testing.

A total body bone scan with spectrometry was performed on November 24, 2006, at rheumatologist Dr. Lipson's request. The radiologist reported mild focal uptake in both knees in keeping with arthropathy and "[a]ctivity also in keeping with arthritic change noted in both sternoclavicular joints and small joints of both hands and feet." PLA-CL-IDI-000473. There was no definitive

diagnostic impression. Dr. Lipson ordered certain lab work done in 2005, which revealed that Plaintiff's anti-nuclear antibodies and rheumatoid factor were negative.

### C. 2007 Records

In a follow-up with nephrologist Dr. Wu on April 30, 2007, Plaintiff reported that he "feels fatigued," has "occasional pain at the tibial-fibular joint," and was experiencing paresthesia. PLA-CL-IDI-000674. Dr. Wu noted some muscle-wasting distally. He urged Plaintiff to obtain a nerve conduction study and asked him to repeat the renal function and serological tests. Id.

Plaintiff was referred to rheumatologist Dr. Yan Liu by his former primary care physician Dr. Antoun A.M. Toma.[2] In a letter dated August 16, 2007, to Dr. Toma, Dr. Liu recounted that since last year Plaintiff had been developing increasing polyarticular pain involving small and large joints with some morning stiffness. Dr. Liu noted the abnormal repeat bone scan findings of multi-articular uptake in small and large joints. Dr. Liu observed that although the negative rheumatoid factor and benign joint exam "goes against rheumatoid arthritis that can manifest as scleritis," he "certainly would keep it within the differential diagnosis." PLA-CL-IDI-000669-670.

---

[2] There are a few illegible handwritten notes from Dr. Toma in the record. A letter from Dr. Toma indicates he terminated Plaintiff as a patient on December 4, 2008, due to Plaintiff's "total disagreements with the receptionist as well as the doctor." PLI-CL-IDI-000648.

On November 26, 2007, Plaintiff was seen in follow-up by Dr. Liu for "small vessel vasculitis (possibly Wegener's [granulomatosis])[,]" the manifestations of which have included red cell casts, scleritis and joint pain. PLA-CL-IDI-000661. Dr. Liu noted that Plaintiff's repeat serology was unremarkable. Id.

**D.    2008 Records**

Plaintiff saw nephrologist Dr. Wu on January 18, 2008, in follow-up, for diagnoses of proteinuria and possible microscopic polyangiitis. He did have some occasional elbow pain and right patellar discomfort. Dr. Wu observed "no overt inflammation" and "no active joints." PLA-CL-IDI-000651.

On October 5, 2006, a handwritten note from opthamologist Dr. Calvin Breslin indicates that he saw Plaintiff for his left eye episcleritis with limbic keratitis. Dr. Breslin prescribed 60 mg of prednisone which should eventually be tapered to 40 mg. PLA-CL-IDI-000512.

**E.    2009 Records**

Plaintiff saw rheumatologist Simon Carette, M.D. on March 18, 2009, for assessment of possible vasculitis. PLA-CL-IDI-001029-1031. Dr. Carette noted that for the past 6 months, Plaintiff had had progressive left sub-costal fullness, progressive anorexia, decreased energy, and progressive burning sensations in the hands and feet bilaterally, and enthesitis of the right Achille's tendon, all of which improved significantly with prednisone. On

examination, Plaintiff had diffuse erythema of left cornea with significant thinning, no tender or effused joints, and unremarkable neurological findings. Plaintiff's scleritis was noted to be severe, and Dr. Carette determined that an emergency consult with opthamologist Dr. Breslin was indicated. Dr. Carette found it "quite difficult to provide a unifying diagnosis" and accordingly requested more bloodwork.

Plaintiff saw Dr. Breslin again on March 19, 2009, at Dr. Carette's request, for Plaintiff's "active scleritis with corneal thinning of left eye" and inability to taper his prednisone dosage (10 mg) any further. PLA-CL-IDI-000514. Dr. Breslin indicated that Plaintiff should increase the prednisone to 60 mg daily and add an immunosuppressant, Imuran (azothioprine); once the eye was clear, he could taper off the prednisone. PLA-CL-IDI-000515.

Plaintiff returned to see Dr. Wu on March 20, 2009, who, as far as a renal diagnosis, wrote "[q]uery microscopic polyanginitis or Wegener's granulamatosis." Dr. Wu noted that when Plaintiff was on prednisone, his scleritis and polyarthralgia "improved significantly." PLA-CL-IDI-0005. However, he was still awaiting Dr. Carette's assessment as to further treatment.

**F.    2010-2011 Records**

There are no office visit notes or other medical records from these years in the Administrative Record. Although Plaintiff did see rheumatologist Dr. Larry Moreland on May 20, 2011, this note is

not contained in the Administrative Record.

### G.    2012 Records

Plaintiff saw his new primary care physician, Todd Orszulak, D.O., on May 2, 2012, and June 13, 2012, and review of systems was negative for fatigue. PLA-CL-IDI-001313-1317. On September 17, 2012, Dr. Orszulak's review of systems was positive for fatigue. PLA-CL-IDI-001321-1323.

### H.    2013 Records

On January 24, 2013, Plaintiff saw Dr. Orszulak. Review of his musculoskeletal system was negative for joint pain or muscle pain. PLA-CL-IDI-000279. On March 27, 2013, Plaintiff returned to see Dr. Orszulak for "[w]orsening fatigue" in regards to his "possible 'Polychrondritis.'" He was taking prednisone for left eye episcleritis diagnosed in 2006 by Dr. Breslin, but it was not helping the fatigue or arthritis. PLA-CL-IDI-000285. Dr. Orszulak noted that Plaintiff was "++ for fatigue." PLA-CL-IDI-000286.

Plaintiff underwent a rheumatology evaluation by Dr. Ernesto Levy, M.D. at Invision Health Brain and Spine Center on April 30, 2013. PLA-CL-IDI-001295-1298. Dr. Levy noted that

> [o]ver the last several years [Plaintiff] experienced progressive symptoms such as fatigability to the extreme that he would feel dizzy and close to collapse if off prednisone. He . . . would become very sick if his prednisone was lowered and extremely sick if completely tapered down. . . . [T]he current dose is prednisone 10 mg p.o. daily. In lowering this dose [Plaintiff] would experience dizziness, lightheartedness, a sensation of heaviness in his head, excruciating joint pain with involvement of MCP and PIP joints as well as knee joints

and metatarsophalangeal joints. He would also have
worsening eye symptoms with reddening, photophobia, and
he states an overall a relapse of his scleritis. In
addition there would be low beck pain, end muscle spasms
at diverse locations.

PLA-CL-IDI-001295. Dr. Levy observed that "[a]s of now, his illness

remains undiagnosed[,]" but "[s]ome of the described features would

have the prints of an inflammatory rheumatologic condition

(scleritis, abnormal urine); however some other features are less

specific (fatigue, dizziness)." PLA-CL-IDI-1296. Dr. Levy's "review

of systems" was "[r]emarkable for extreme fatigue, headaches, and

dizziness to the point that the patient would collapse; at times

even holding himself to a fixed object so not to fall. He has

experienced ear tinging, excessive thirst, and anxiety. He has also

experienced swelling of his feet. Most symptoms exacerbate or are

only evident when he is off prednisone. Moderate joint pain and

important fatigability still occur at a dose of prednisone 10 mg

p.o. daily." Id. On examination, there was no formal synovitis, and

all joints had full range of motion. PLA-CL-IDI-001296. "Palpation

of joints [did] not cause pain," Dr. Levy stated, "though the

patient feels some degree of arthralgia at all times." Id. Dr. Levy

described Plaintiff's case as "high-complexity . . . as no dear

localizing manifestation exists[;] "[t]he more compelling

manifestations include arthralgia, fatigability (at some times

extreme), scleritis (well documented), and intolerance to a

prednisone taper." PLA-CL-IDI-001297. Dr. Levy recommended a new

baseline blood work-up and introduction of a steroid-sparing agent (e.g., Imuran) and a slow taper of prednisone under the guidance of an endocrinologist in order to learn more about the disease.

Plaintiff saw rheumatologist Dr. Moreland on May 3, 2013, PLA-CL-IDI-000399-403, who noted that he had last seen Plaintiff on May 20, 2011.[3] Plaintiff had brought long-term disability papers to discuss with Dr. Moreland. PLA-CL-IDI-000403. Under current medical problems, Dr. Moreland noted, _inter alia_, relapsing polychondritis; history of intermittent pain and swelling of ears and nose; history of scleritis; polyarthritis, nonspecific; and severe fatigue. PLA-CL-IDI-000399. Under interval history, Plaintiff reported to Dr. Moreland that he had moved from Pennsylvania to Niagara Falls to be closer to his family as he was "having continued problems with functioning and working" as a neurologist in Buffalo. "Fatigue continues to be a big issue," and he continued to have "intermittent pain." Plaintiff informed Dr. Moreland that he "would like to quit work because he is not able to continue to keep up with the pace." PLA-CL-IDI-000399. On review of Plaintiff's musculoskeletal system, Dr. Moreland noted "[g]ood range of motion of all joints" and "[n]o active synovitis." id. Plaintiff's head, ears, nose, and throat were normal with "no obvious pain or

---

[3] That office visit note was not provided by Dr. Moreland in response to Defendant's records request, likely because Defendant, in processing Plaintiff's disability claim, only sought records from January 1, 2013, until the present. Plaintiff has represented to the Court that he will obtain the treatment note if it is required.

inflammation of external parts of ears." Id. Dr. Moreland "recommend[ed] that [Plaintiff] stop work completely based on his current medical problems," and said he would complete the disability paperwork accordingly. Id. There were no changes to Plaintiff's medications.

On May 30, 2013, Plaintiff saw primary care physician Dr. Orszulak for his annual visit. PLA-CL-IDI-000281. On examination of Plaintiff's musculoskeletal system, Dr. Orszulak noted normal range of motion of all joints, no effusions, and no swelling or deformity. Id. As far as subjective complaints, Plaintiff denied joint pain, joint swelling, morning stiffness, or muscle pain, but he was having fatigue. PLA-CL-IDI-000282.

Dr. Mallika Rajarathna, whose speciality is unclear but who appears to have been a primary care provider, saw Plaintiff on August 21, 2013, and September 4, 2013. Her notes are hand-written and very difficult to read. Dr. Rajarathna lists Plaintiff's diagnosis as "? Relapsing polychondritis" on one note and as "relapsing polychondritis—stable" on another note. PLA-CL-IDI-000638. Dr. Rajarathna noted that Plaintiff "plans to get disability."

On September 13, 2013, Plaintiff returned to see Dr. Moreland in Pittsburgh and reported he was "about the same" as in May of that year. On examination, Plaintiff had "[s]light tenderness of the left earlobe" without significant redness; his nasal cavities

appeared normal. With regard to his musculoskeletal system, Dr. Moreland noted "[n]o active synovitis." PLA-CL-IDI-000409. Dr. Moreland noted that Plaintiff was "currently maintained on low dose prednisone" and advised him to return in 6 months. Id.

### I.   2014 Records

Plaintiff consulted with two new rheumatologists in 2014, after he filed his disability claim: Dr. Joseph M. Grisanti and Dr. John H. Stone. Both agreed that he was totally disabled. Their evaluations and reports are discussed in more detail in Section V.A, infra.

## II.  The Issuance of the Disability Policy

On October 24, 2011, Plaintiff obtained a position as a neurologist at Mount St. Mary's Hospital ("the Hospital") in Lewiston, New York. The Hospital is now known as Ascension Health. In connection with his employment application, Plaintiff was asked to complete a medical history questionnaire, essentially a "check-the-box" form, and undergo an examination (which was "[n]ormal"). PLA-CL-IDI-000967-973. Plaintiff checked the boxes indicating that he had high blood pressure, arthritis, and diabetes mellitus, and that he had "pain in muscles, joints, stiffness, bursitis, gout – for year [sic]." There does not appear to be a box or space on the form where the applicant was asked if had medical conditions or diagnoses other than those listed.

On June 15, 2012, Plaintiff applied for an individual

disability benefit policy through Ascension Health from Defendant. Defendant issued Disability Income Policy No. 06-6297809 ("the Disability Policy") with an effective date of July 1, 2012. PLA-AP(6297809)-000001. The Disability Policy is governed by ERISA and provides for a basic monthly disability benefit of $6,249 for an insured under age 64 when the relevant disability occurs, until the insured reaches age 67. Id. Terms of the Policy relevant to the present case include the following definitions:

> **Disability or Disabled** means that You [i.e., the insured] are Totally Disabled. Disability must start while this Policy is in force. A Disability begins with an Elimination Period and has a Maximum Benefit Period applied to it.

PLA-AP(6297809)-000020 (boldface in original).

> **Total Disability or Totally Disabled**, for the first 12 months of benefit payments during a Disability, means that because of Injury or Sickness:
>
> 1. You are not able to perform the material and substantial duties of Your Occupation; and
> 2. You are receiving Physician's Care. We [i.e., the insurer] will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.
>
> After Total Disability benefits have been payable for 12 months during a Disability, then Total Disability means that because of Injury or Sickness:
>
> 1. You are not able to perform the material and substantial duties of Your Occupation; and
> 2. You are not able to perform the material and substantial duties of Any Occupation; and
> 3. You are receiving Physician's Care. We will waive this requirement if we receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

PLA-AP(6297809)-000022 (boldface in original).

> **Sickness** means sickness or disease that first manifests itself after the Effective Date and while [the] Policy is in force. . . .

PLA-AP(6297809)-000021 (boldface in original).

> **Your Occupation** means the occupation or occupations in which You are regularly engaged at the time You become Disabled.

PLA-AP(6297809)-000022 (boldface in original).

> **Any Occupation** means Any Occupation for Which You are reasonably fitted based on education, training or experience.

PLA-AP(6297809)-000020 (boldface in original).

As far as the proof required for establishing entitlement to

benefits, the Policy provides as follows:

> **Written Proof of Loss**
> Written proof of loss must be sent to Us within 90 days after each monthly period for which You are claiming benefits. . . .
>
> We can require any proof that We consider necessary to consider Your claim. This may include medical information, personal and business tax returns filed with the Internal Revenue Service, financial statements, accountant's statements or other proof acceptable to Us.
>
> **Examinations**
>
> At Our Expense, we can require that You undergo a medical examination, functional capacity examination, psychiatric examination, and/or psychological examination including any related tests as are reasonably necessary to the performance of the examination by a Physician or specialist appropriate for Your condition at such time and place and as frequently as We may reasonably require. We reserve the right to select the examiner. . . .

PLA-AP(6297809)-000027 (boldface in original).

A rider to the Policy provides that "Disability or Disabled . . . is amended to include Residual Disability or Residually Disabled." PLA-POL(6297809)-IDI-000028. The rider states that

> Residual Disability or Residually Disabled means that You are not Totally Disabled, but due to Injury or Sickness:
> 1. You are not able to perform one or more of the material and substantial duties of Your Occupation; or You are not able to perform them for as long as normally required to perform them; and
> 2. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You.

PLA-POL(6297809)-IDI-000030.

## III. Plaintiff's Cessation of Work and Application for Benefits Under the Policy

Plaintiff's last day of work at the Hospital was June 9, 2013.[4] On June 10, 2013, Plaintiff applied for benefits under the Disability Policy, stating that he was 49 years-old and was disabled based on relapsing polychondritis and polyarthralgias, which were diagnosed by his treating rheumatologist, Dr. Moreland.[5]

### A. Information Provided by Plaintiff

In support of his disability benefits application ("Application"), Plaintiff submitted an Attending Physician

----

[4]

The Hospital terminated his contract of employment effective June 30, 2013, because, according to Hospital representative Deborah Nichols, he was not meeting the minium billing requirements or seeing a sufficient number of patients per day. PLA-CL-IDI-000235.

[5]

The parties dispute when Dr. Moreland first diagnosed Plaintiff with relapsing polychrondritis, i.e., before or after he was hired by the Hospital. Resolution of this question is not material to Plaintiff's claim under the Disability Policy.

Statement ("APS") from Dr. Moreland, whom he had first seen on September 4, 2009, and had most recently seen on May 3, 2013. See PLA-CL-IDI-000028-29. When asked to list Plaintiff's "Current Restrictions," i.e., "activities patient should not do;" and "Current Limitations," i.e., "activities patient cannot do," Dr. Moreland stated, "[s]evere joint pain, fatigue, recurrent polychrondritis." PLA-CL-IDI-000028. In response to the question on the form regarding "[w]hat diagnostic or clinical findings support [his] patient's work restrictions and limitations[,]" Dr. Moreland answered "[c]linical evaluation." Id.

In a letter dated June 13, 2013, addressed to the Hospital, Dr. Orszulak stated that Plaintiff "should stop work as of June 10, 2013, based on the advice of his Rheumatologist." PLA-CL-IDI-000887.

Defendant requested, by letters dated May 9, 2013; May 20, 2013; and June, 19, 2013, that Plaintiff complete and submit an Individual Statement, Authorization, and Occupational Description. PLA-CL-IDI-000033, 51, 55. In his Individual Statement, Plaintiff indicated that the "[c]ondition [c]ausing [his] [d]isability" was polychrondritis, the symptoms of which were "joint pain" and fatigue," that he first noticed the symptoms in 2006-07, and that the date his "illness began" was 2006. PLA-CL-IDI-000109. When asked which duties of his occupation he was able to perform and for how long, he answered, "limited due to fatigue, joint pain,

difficulty walking, standing." PLA-CL-IDI-000110. When asked which duties he was unable to perform, he referred to his "previous answer." Id.

On the Occupational Statement, Plaintiff indicated that his "job title" was "physician (neurologist)." PLA-CL-IDI-000114. The form asked him to "list and describe [his] occupational duties" and indicate how many hours he spent on each duty each week. Id. Plaintiff listed only one duty, and repeated his job title, stating, "Physician/Neurologist." Id. Under description, he wrote, "evaluate and treat patients in and out patient" which he spent 40 hours each week performing. Id. In the section of the form asking for details about his exertional and postural activities during an 8-hour workday, Plaintiff checked boxes indicating that he was required to sit, stand, walk, balance, and reach "frequently," defined as "34-66%" of the day; and he was required to climb, bend/stoop, kneel, squat/crouch, crawl, use foot controls, twist, carry, push/pull, and lift "occasionally," defined as "1-33%" of the day. PLA-CL-IDI-000115.

On July 18, 2013, Beth Robinson, Senior Disability Benefits Specialist ("Benefits Specialist Robinson"), conducted the initial phone interview with Plaintiff. PLA-CL-IDI-000168-172. Plaintiff informed her that he has had disabling medical condition "since 2006 and it gradually progressed." PLA-CL-IDI-000168. Plaintiff explained that he is now on prednisone, which is "taking care of

his eye and arthritis," but his "fatigue keeps increasing." The pain sometimes "breaks through" and he "has to go into the hospital." When he saw patients, he had "difficulty standing and walking" and "avoided standing as much as he could" because "[i]t felt like he had 1000 lbs on his legs and he would fall[,]" and the prednisone "also made him dizzy." PLA-CL-IDI-000169. When he saw a patient, he would "immediately" look to see if there was a chair, but if not, he "held onto the patient's bed, since he did not trust himself to stand for a long time." Id. Sometimes, if there was no chair, he would pretend to lean over the bed. Id. That would help him restrain himself. Plaintiff continued to work though the fatigue and pain were still there; he only told a few people about his condition because he was trying to survive in a competitive medical market. PLA-CL-IDI-000171.

On October 20, 2013, Dr. Moreland submitted another APS as requested by Defendant. Under the section on Functional Capacity, Dr. Moreland indicated that on a day-to-day basis, Plaintiff could sit, stand, walk, climb, twist/bend/stoop, reach above shoulder level, and operate heavy machinery "[o]ccasionally," which the form defined as "1-33%" of the time. PLA-CL-IDI-000616. He could occasionally lift up to 10 pounds, but he could never lift greater than 10 pounds. Id. Dr. Moreland stated that Plaintiff was still "unable to work" and that "no improvements" were expected in his restrictions and limitations. Id.

**B.  Defendant's Vocational Consultant**

Defendant's Senior Vocational Resource Consultant, David Gaughan ("VRC Gaughan"), reviewed the file including Plaintiff's billing production reports, physician statements, occupational description, and statement from his previous employer. In a report issued August 29, 2013, VRC Gaughan stated that in his opinion, Plaintiff's billing production was low for the period of January 1, 2013, to June 9, 2013. PLA-CL-IDI-000348. Given Plaintiff's reported specialty of neurology, billing production beyond that for office/inpatient exams would be expected. Id. "Based on information present in the file," VRC Gaughan determined that "the demands of this occupation" would require "light exertion," defined as follows:

> exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

PLA-CL-IDI-000348 (quoting PAQ Services, Inc.'s Enhanced Dictionary of Occupational Titles, data as of 8/29/13). Gaughan also listed the "[c]ognitive considerations" entailed in Plaintiff's job, which included maintaining attention and concentration, adhering to

medical protocols and standards, making independent medical judgments, and communicating clearly in speech and written language. Id.

### C. File Reviews by Defendant's Medical Experts

#### 1. Dr. Norman H. Bress

Benefits Specialist Robinson subsequently requested a review of Plaintiff's Application from in-house medical consultant Norman H. Bress, M.D., board-certified in internal medicine and rheumatology. In her request, Benefits Specialist Robinson noted that the "R[estrictions] & L[imitations]" assessed by Dr. Moreland—that Plaintiff was "[u]nable to work"—were "unclear and further review will be needed." PLA-CL-IDI-000539. Benefits Specialist Robinson requested that Dr. Bress answer the following questions: "1. Are R&L's supported as per Dr. Moreland? If so, when did R&L's begin? 2. What is the duration of the R&L's? 3. When should [medical record] be updated for review?" Id.

Dr. Bress issued his report on October 8, 2018. PLA-CL-IDI-000539-543. After he "reviewed the entire medical file," Dr. Bress agreed that Plaintiff's "physical findings (although minimal) are consistent with a diagnosis of RP [i.e., relapsing polychrondritis]," although he was "unable to locate results of a cartilage biopsy to confirm the diagnosis." Id. However, Dr. Bress concluded, even "[i]f the insured has RP, it is [his] opinion that it is mild or very well controlled and therefore does not support

restrictions or limitations for the following reasons:

> 1. minimal recent physical findings-slight tenderness left ear lobe-no other findings to suggest the presence of RP such as ear redness, atrophy of ears or nasal cartilage
> 2. maintained only on low dose prednisone (10 mg daily)-no need for immunosuppressives[6]
> 3. most recent ESR and CRP[7] normal
> 4. follow up visit with Dr. Moreland in 6 months-more frequent visits would have been indicated if RP was active or severe[.]"

PLA-CL-IDI-000542. With regard to the other diagnosis listed on Dr. Moreland's APS (polyarthritis), Dr. Bress observed that examinations and laboratory findings have revealed no abnormal joint findings (e.g., no active joints or synovitis, negative antinuclear antibodies and rheumatoid factor) to suggest the presence of a polyarthritis. Therefore, Dr. Bress opined, if a polyarthritis is present, it is extremely mild and does not support restrictions or limitations. Finally, none of Plaintiff's co-morbid conditions (hypertension, steroid induced diabetes, dyslipidemia, scleritis in the left eye, polyneuropathy, vitamin D deficiency, osteoarthritis, and osteopenia) were being claimed as impairing. Taking into consideration all of Plaintiff's conditions, both individually and in totality, it was Dr. Bress's opinion that

---

[6]

Contrary to this statement, several of Plaintiff's treatment providers, including Dr. Levy, recommended introduction of immunosuppressants. E.g., PLA-CL-IDI-0001298.

[7]

However, as Dr. Bress admitted, the "erythrocyte sedimentation rate/ESR" and "C-reactive protein/CRP" are "*nonspecific* blood test[s] for inflammation, *often* elevated in active RP [relapsing polychrondritis]." PLA-CL-IDI-000541 (emphases supplied).

restrictions and limitations are not supported on a physical basis.

On October 15, 2013, Dr. Bress spoke with Dr. Moreland via telephone and submitted an addendum to his report that same day, PLA-CL-IDI-000562, summarizing the call as follows:

> Dr. Moreland stated that exam findings and results of lab tests are normal. In view of these findings, Dr. Moreland stated that he is not supporting any restrictions or limitations. Dr. Moreland mentioned that the insured states that he is unable to work because of fatigue, but there is nothing on exam and lab data to support this claimed impairment. Dr. Moreland is in agreement with my assessment as noted in my reviews. My opinion therefore remains the same.

PLA-CL-IDI-000569. Also on October 20, 2013, Dr. Bress sent a letter to Dr. Moreland, repeating the above summary, for purposes of confirming the essence of their conversation. PLA-CL-IDI-000569-570. Dr. Moreland returned a copy of Dr. Bress' letter, on which he included the following handwritten note:

> As a Rheumatologist I see several patients with autoimmune diseases who report fatigue as a major problem. There is no blood test or approved questionnaire that accurately measures fatigue. Most often patients have normal lab (routine) and exams. So, although I have not placed any restrictions on work for Dr. Khan, he reports he cannot function with his current occupation. So, I support his claim for disability.

PLA-CL-IDI-000612.

After reviewing this response, Dr. Bress's opinion remained "unchanged" because Dr. Moreland failed to provide "supporting evidence[,]" "such as findings on exam that the insured appeared fatigued or chronically ill, had difficulty with movements such as rising onto and off the exam table, or other clinical findings."

PLA-CL-IDI-000621-622.

Meanwhile, Dr. Bress attempted to schedule a peer phone call with Plaintiff's most recent primary care provider, Dr. Rajarathna, but was unable to do so. Accordingly, he sent her several questions to answer. In particular, she was asked to list any restrictions (activities which Plaintiff should not perform) and limitations (activities which he is unable to perform). Dr. Rajarathna sent a letter on November 29, 2013, stating in pertinent part, that Plaintiff's "mental situation is greatly affected by his disability," that he "says he doesn't have any physical strength to maintain any function," and that he is "unable to maintain any position in any length of time without pain. He did not find any period of time that he is symptoms [sic] free." PLA-CL-IDI-000756. Dr. Rajarathna concluded by stating that she believed Plaintiff would not be able to continue his career as a neurologist. Id.

Meanwhile, in a phone call with Benefits Specialist Robinson, on November 8, 2013, Plaintiff's attorney at the administrative level, Michael Quiat, Esq. ("Attorney Quiat") stated that "he spoke with Dr. Moreland and does not think the physician understands R[estrictions] & L[imitation]s. He will talk with the doctor to verify if he will provide additional information to us" about R&Ls. PLA-CL-IDI-000719. On November 18, 2013, Dr. Moreland sent a follow-up letter to Dr. Bress to clarify his position regarding Plaintiff's restrictions and limitations. He stated,

As a rheumatologist, I have experienced many patients who suffer with autoimmune diseases resulting in significant fatigue and other symptoms. Not all of those symptoms are verifiable by objective evidence, though they are no less real or debilitating.

Dr. Khan reports intermittent periods of dizziness, left ear pain, burning in the feet, arthralgia (causing difficulty walking and standing) and significant pain.

In the case of Dr. Khan, his positive findings on examination include elevated blood pressure, tachycardia, fluid in the ears, redness in the left eye due to scleritis, decreased left nasolabial fold with mild ptosis and swelling right knee.

Clearly given the above, Dr. Khan is restricted and limited from performing the regular and substantial duties of evaluating and treating patients both in the in patient and outpatient settings.

Unless and until these symptoms resolve, he will continue to be unable to perform such responsibilities.

PLA-CL-IDI-000754.

In an addendum to his report dated November 18, 2013, Dr. Bress indicated that notwithstanding Dr. Moreland's latest letter, his opinion remained "unchanged." PLA-CL-IDI-000767.

Dr. Bress also evaluated Dr. Rajarathna's letter, which did not change his opinion because she "lists symptoms, but no physical findings." Dr. Rajarathna mentions lack of physical strength, but does not mention documentation of muscle weakness on exam; likewise, she mentions Plaintiff's "mental situation" but does not provide any cognitive deficit noted on exam. PLA-CL-IDI-000767-768. Dr. Bress observed that since the "physical findings and results of lab tests are not in dispute, but rather the interpretation of

these findings as they relate to the insured's functionality, a DMO [Designated Medical Officer] rather than an IME [Independent Medical Examination] opinion will be requested." PLA-CL-IDI-000768.

Dr. John G. Paty, Jr., board-certified in internal medicine and rheumatology, was the DMO who performed a paper-review and concurred with Dr. Bress's opinion. PLA-CL-IDI-000772-775. Dr. Paty's December 5, 2013 report consists almost entirely of a recitation of the medical records. His opinion was that "[w]ithin a reasonable degree of medical certainty," "the medical record did not support impairment noted by Dr. Moreland" "because [the] physical findings[,]" the "laboratory data[,]" "the claimant's activities," the absence [of] medication changes with recent reported symptoms, with Prednisone continued at the same dosage, and the six-months return visit with Dr. Moreland rheumatology AP were inconsistent with impairment due to Relapsing Polychondritis or pain due to multiple joint pain (polyarthralgia) and fatigue." PLA-CL-IDI-000775. Dr. Paty referred specifically to the following activities as contradicting Dr. Moreland's opinion: "day-to-day activities of reading, computer use, occasional household chores noted in his statements, working until the DOD [Date of Disability], and grocery shopping." Id. According to Dr. Paty,[8] no

---

[8] Contrary to Dr. Paty, Plaintiff told Senior Disability Specialist Robinson that he did not shop at grocery stores because they are too big; instead, he goes to the gas station to get what he needs. He uses his car as much as possible and avoids walking. PLA-CL-IDI-000170.

further medical investigation was necessary. Id.

## IV. Defendant's Denial of Benefits

By letter dated December 11, 2013, Benefits Specialist Robinson informed Attorney Quiat that Defendant was denying Plaintiff's claim, PLA-CL-IDI-000804-810, because the "medical information . . . received does not support an impairment that would prevent him from being able to perform the duties of his occupation. As such, he is not eligible to receive Total Disability benefits, Residual Disability benefits, Recovery benefits or Waiver of Premium." PLA-CL-IDI-000805. Benefits Specialist Robinson explained that the medical records "do not support an impairment because physical findings, laboratory data, Dr. Khan's activities, the absence of medication changes with recent reported symptoms and Prednisone continued at the same dosage, as well as the six-months return visit with his treating physician are inconsistent with impairment due to Relapsing Polychondritis or pain due to polyarthralgia and fatigue." PLA-CL-IDI-000805. The denial letter also noted that Plaintiff's "Individual Disability Status Update forms completed in July and August 2013 noted difficulty with mobility, fatigue, and any form of physical exertion, which is inconsistent with physical findings noted by Dr. Moreland in 2013 and by Dr. Orszulak." PLA-CL-IDI-000805-806. Moreover, Plaintiff's "reported day-to-day activities of reading, computer use, occasional household chores noted in his statements, working until

-27-

June 2013, and grocery shopping are inconsistent with an impairment of recurrent polychondritis." PLA-CL-IDI-000806. As to the diagnosis of polyarthritis, Benefits Specialist Robinson observed that Plaintiff's "examinations revealed no abnormal joint findings to suggest the presence of this condition[,]" and therefore, "if this condition is present, it is extremely mild and does not support restrictions or limitations." Id.

## V. The Administrative Appeal

### A. Plaintiff's Appeal Letter, Supporting Documents and New Medical Opinions

Attorney Quiat requested Plaintiff's claim file via letter dated April 21, 2014, and the matter was reassigned to Lead Appeals Specialist Richard A. Enberg ("Appeals Specialist Enberg"). PLA-CL-IDI-000839. Plaintiff's formal appeal and letter brief were filed on June 9, 2014. PLA-CL-IDI-000865-880. Attorney Quiat also submitted a supporting certification from Plaintiff, PLA-CL-IDI-000881-885, and several medical records that were already on file with Defendant. In addition, Attorney Quiat submitted a new opinion from rheumatologist Dr. Joseph M. Grisanti, whom Plaintiff saw on April 10, 2014. PLA-CL-IDI-000896-898. Dr. Grisanti noted Plaintiff's history of scleritis, proteinuria, relapsing polychrondritis and arthralgias. Dr. Grisanti recommended that Plaintiff pursue early retirement or disability because of his inability to function as the result of the "dominating fatigability" associated with the foregoing diagnoses. Dr. Grisanti

was not optimistic that Plaintiff's symptoms would resolve.

Finally, Attorney Quiat submitted a Notice of Award from the Social Security Administration ("SSA"), indicating that Plaintiff was entitled to monthly disability benefits beginning December 2013.  PLA-CL-IDI-000900-903.

By letter dated July 24, 2014, Attorney Quiat submitted a supplemental report from rheumatologist John H. Stone, M.D., M.P.H., dated July 23, 2014, along with Dr. Stone's clinical notes of his appointment with Plaintiff on May 29, 2014. PLA-CL-IDI-000954-958. Dr. Stone opined that the diagnosis of polychondritis was confirmed not only by the records but by the test results and his clinical evaluation of Plaintiff. Given this diagnosis, Dr. Stone stated, Plaintiff's complaints of severe fatigue and pain were "reasonable and expected symptoms of his [r]elapsing [p]olychrondritis." Dr. Stone indicated that he was familiar with the types of physical requirements demanded by hospital-based medicine, and that, given Plaintiff's diagnosis of relapsing polychrondritis and physical manifestations of the condition, Plaintiff was totally disabled from his prior occupation. Dr. Stone explained that his opinion was based on his past experience in treating relapsing polychrondritis, his clinical observations of Plaintiff, and a review of his medical history.

**B.   The SSA Decision**

With Plaintiff's permission, Appeals Specialist  Enberg

obtained the Social Security Disability Insurance ("SSDI") file from the SSA. PLA-CL-IDI-000917. The SSDI file was received by Defendant at some point after August 15, 2014, and before October 17, 2014.

Plaintiff's application was completed online and processed over the phone. The SSA representative who interviewed Plaintiff described him as polite and knowledgeable, and stated that he "sounded very tired." A final decision was issued by a single decision maker[9] on November 18, 2013. PLA-CL-IDI-001217-1253. Plaintiff alleged disability based on relapsing polychondritis with fatigue and arthralgia. PLA-CL-IDI-001228. The medical records requested by the SSA were from Dr. Orszulak and Dr. Moreland, for the period from 2012 to the present. PLA-CL-IDI-001228, 1254-1261. Plaintiff described his duties during a typical workday as follows: walking, standing, and sitting for 2.5 hours each; and stooping, kneeling, and crouching for 1 hour each. PLA-CL-IDI-001223. He did not have to lift or carry anything heavier 10 pounds. Id. The SSA found that no consultative examination was required; that Plaintiff had the "severe" impairment of "other disorders of the nervous system" and the "non-severe" impairment of "diabetes mellitus";

_____

[9]     Under the SSA's SDM model, a disability examiner could make the initial determination in most cases without obtaining the signature of a medical consultant.
https://www.federalregister.gov/documents/2018/12/12/2018-26803/modifications-to-the-disability-determination-procedures-end-of-the-single-decisionmaker-test-and
(last accessed Apr. 26, 2019).

that his subjective complaints were substantiated by the objective medical evidence alone; and that there were no medical opinions. PLA-CL-IDI-001230. The SSA concluded that Plaintiff had the residual functional capacity ("RFC") to stand and/or walk (with normal breaks) for "significantly less than 2 hours" and sit (with normal breaks) for about 6 hours in an 8-hour workday. PLA-CL-IDI-001231. The SSA found that "due to extreme fatigue," Plaintiff was "unable to [perform] a 40 hour/week job." Id. When asked to explain how and why the evidence supported the limitations imposed, the SSA cited bone scans in 2006 indicating arthritic changes in the hands and feet. He also stated that Plaintiff got an infection in 2004,[10] and since that time has been unable to discontinue prednisone; that he has established joint pain; that he experiences extreme fatigue, headaches, and dizziness to the point where he would collapse or need to hold onto a fixed object so as not to fall; and that he has experienced swelling in his feet and has left-sided facial droop. The SSA concluded that Plaintiff did not have the RFC to perform his past relevant work as a neurologist (Dictionary of Occupational Titles ("DOT") code 070.101-050).[11] Because Plaintiff's impairment

---

[10]      It is unclear to what the decision is referring as there are no medical records from 2004, and no reference in the medical records available that Plaintiff ever had an infection that was treated with prednisone. This may be a reference to Plaintiff's left eye episcleritis which was treated with prednisone.

[11]      A neurologist is classified as a light exertional level job in the DOT. See http://www.govtusa.com/dot/dot01b.htm; https://occupationalinfo.org/07/070101050.html (last accessed Apr. 26, 2019).

was "so severe that he is limited to significantly less than a full range of sedentary work," Medical-Vocational Rule 204.00 directed a finding of disability. PLA-CL-IDI-001232.

### C. Defendant's Medical Consultant's Review on Appeal

Defendant's in-house medical consultant Beth Schnars, M.D., board-certified in internal medicine, conducted a paper review of Plaintiff's claim and issued a report. PLA-CL-IDI-000934-939. In pertinent part, Dr. Schnars agreed that relapsing polychondritis, "a rare autoimmune disorder characterized by progressive inflammation of cartilage particularly of the ears, nose, and trachea with cartilage destruction," "can also be associated with polyarthritis and ocular symptoms[,]" such as alleged by Plaintiff. PLA-CL-IDI-000937. Dr. Schnars commented that the treatment for this disorder was "low dose steroids with addition of other immune modulating agents for unremitting symptoms." Id. "While some symptoms are supportive of this diagnosis," she noted, "the medical records provided do not [sic] severity [sic] symptoms, aggressive treatment or exam findings supportive of significant underlying pathology[,]" PLA-CL-IDI-000937, since "[s]erial peripheral joint exams by various providers since 2005 have all been normal without any documentation of significant tenderness or synovitis[;]" and "[t]here has been no evidence of cartilaginous inflammation or the ears/nose/trachea (the ear lobe does not contain cartilage)." Id.

Dr. Schnars noted that rheumatologist Dr. Grisanti's office

visit note "remarked on tenderness of the upper aspect of the left ear without swelling/redness," and Dr. Moreland mentioned "left eye ptosis with nasal labial flattening in [his] letter of advocacy in 11/13[,]" but "[t]hese findings have been present since 2006[,] are not suggestive of polychondritis[,] and would not contribute to functionality." PLA-CL-IDI-000937. Serial connective tissue panels and inflammatory markers have all been negative since 2005. Dr. Schnars observed that while Plaintiff's early bone scans noted mild peripheral joint uptake, no provider has recently recommended bone imaging "as would be anticipated for unremitting pain limiting functionality." PLA-CL-IDI-000937. Morever, there have been no medication changes recommended as would be anticipated for uncontrolled symptoms due to underlying rheumatologic disorder; instead, Plaintiff has been self-prescribing prednisone (10 mg daily) since 2009, and there have been no medications used for joint pain. Id.

Dr. Schnars noted that Dr. Moreland "recommended work cessation due to fatigue/arthralgias when presented with disability papers[,]" in May 2013, but a primary care note from May 30, 2013, "documented no reports of arthralgias or ear pain with normal exam."

Considering Plaintiff's general medical diagnoses (polychondritis, episcleritis, arthralgias, diabetes, fatigue, chronic pain, hypertension and neuropathy) collectively and

individually, in a "whole person analysis," Dr. Schnars found they
"do not rise to the level of impairment from or since the [date of
disability]" because all of Plaintiff's supporting medical expert
opinions from Dr. Moreland, Dr. Rajarathna, Dr. Grisanti, and Dr.
Stone were "based on self reports of long standing fatigue without
supporting evidence of abnormalities on exam or lab findings and
lack of aggressive medical management." After reviewing
rheumatologist Dr. Stone's letter and clinical notes, Dr. Schnars
issued an addendum finding that they did not change her opinion.
PLA-CL-IDI-000960.

### D.    "No Deference" Review by Outside Medical Expert

Appeals Specialist Enberg, after conferring with Dr. Schnars,
decided to obtain a "no deference" medical review of the file by an
outside physician credentialed in rheumatology. Dr. Schnars
provided the following questions for the outside rheumatologist's
paper IME: whether the medical records support the diagnosis of
polychondritis; whether the medical records support any
restrictions or limitations for any period from June 10, 2013;
whether the intensity of treatment, frequency of evaluation, exam
findings and diagnostic testing consistent with severity of
underlying disease from polychondritis or other medical conditions;
and whether the medical records reflect any change in condition
around the date of disability from chronic medical issues. PLA-CL-
IDI-000974.

On August 15, 2014, rheumatologist Alfonso Bello, M.D., of the Illinois Bone & Joint Institute, was sent Dr. Schnars's questions, Plaintiff's medical records, and the in-house file reviews performed by Defendant's medical consultants. Dr. Bello was not sent the SSDI file, as it had not been received by that point. PLA-CL-IDI-000986-989.

Dr. Bello submitted his report to Defendant on September 17, 2014. PLA-CL-IDI-001330-1333. In response to Defendant's specific questions, he concluded that the diagnosis of relapsing polychrondritis was confirmed based on the history, clinical examination, and evaluation by two different board-certified rheumatologists. PLA-CL-IDI-001332. Notwithstanding the diagnoses of relapsing polychrondritis and complaints of arthralgias and fatigue, Dr. Bello found "there has been no clear evidence of physical limitations based on objective clinical evidence specifically of abnormal musculoskeletal examinations that would warrant restrictions or limitations based on [a] reasonable degree of medical knowledge." Id. According to Dr. Bello, the level of activity required to practice medicine would fall into the category of sedentary to light duty work exertion requirements but "there has been no data that was provided in the medical records to support restrictions in either category." Id. Dr. Bello determined that the frequency of evaluations, exam findings, and diagnostic testing "appear to be consistent with [Plaintiff]'s diagnosis of

[sic] difficulty in the overall management; however, there is [sic] no treatment guidelines" for relapsing polychrondritis. Id. Finally, as to whether there was any change in Plaintiff's medical condition around the alleged date of disability, Dr. Bello opined that there "appears to be no specific findings that would indicate a flare other than of his scleritis." PLA-CL-IDI-001333. Dr. Bello reiterated that "other than his subjective complaints of arthralgias and fatigue, there were no specific musculoskeletal findings are noted at any of the clinical evaluations reviewed." Id. Therefore, "it is difficult to assess whether in fact there were any major changes through the period of the medical records to the period reviewed." Id.

### E. Denial of the Appeal

On October 17, 2014, Appeals Specialist Enberg sent Attorney Quiat a letter stating that Defendant was denying Plaintiff's appeal. PLA-CL-IDI-001345-1351. The letter chiefly relied on Dr. Bello's file review. Defendant purported to distinguish the SSDI decision on the basis that the SSA did not include a review by a physician, that it was "inconsistent with the medical evidence," that the SSA did not consider unspecified evidence subsequent to October 31, 2013, which was "not supportive of disability," and that the "comprehensive medical reviews by the Unum physician and the specialty medical examiner are compelling evidence in support of work capacity for your occupation."

On November 19, 2014, Defendant submitted additional, unspecified records to Dr. Bello. PLA-CL-IDI-001364. On December 5, 2014, Dr. Bello issued a brief addendum stating that his "previous opinion stands." PLA-CL-IDI-001372-1373. On December 22, 2014, Appeals Specialist Enberg notified Attorney Quiat about having forwarded the additional records to Dr. Bello, and that review of these records did not change Dr. Bello's opinion. PLA-CL-IDI-001378-1379.

## VI.  Plaintiff's Credibility

After reviewing the entire Administrative Record, it is apparent that—in the opinions of Defendant and its in-house and external medical consultants—Plaintiff's claim for long-term disability benefits stood or fell on the credibility of his subjective complaints. A district court's determination as to whether a claimant's complaints of pain and fatigue are or are not credible is a finding of fact subject to appellate review for clear error. Connors, 272 F.3d at 137. The question of whether Plaintiff's subjective complaints are sufficient evidence of disability is legal in nature and subject to de novo review on appeal. Id. (citing LoPresti, 126 F.3d at 39). Thus, before proceeding to the legal issue, the Court must assess the credibility of Plaintiff's complaints and make a factual finding. See id.; see also Fed. R. Civ. P.  52(a)(6).

The Court is guided in its inquiry by the two-step credibility

analysis utilized by adjudicators in the SSDI context.[12] The Court finds that Plaintiff has proven by a preponderance of the evidence— in particular, the unanimous opinions of the physicians who examined him—that he suffers from medically determinable impairment s that could reasonably be expected to produce the pain and fatigue alleged. Defendant's in-house medical reviewers have never meaningfully challenged the validity of any of Plaintiff's diagnoses, and outside rheumatologist Dr. Bello agreed that the diagnosis of relapsing polychondritis was confirmed by the medical record.

Turning to the next step, the Court notes that the SSA found that the severity of Plaintiff's symptoms were wholly substantiated by his own statements in his application and the medical records from Drs. Moreland and Orszulak (which represented but a small subset of the records reviewed by Defendant and its consultants). None of the physicians who examined Plaintiff ever suggested that he was malingering or engaging in symptom magnification.

The Court finds the attempts by Defendant and its medical

---

[12]

See, e.g., Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (unpublished opn.) (the adjudicator first must determine whether the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce" the symptoms alleged, and then "must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry") (quoting 20 C.F.R. § 404.1529 (applicable to claims filed prior to Mar. 27, 2017); citing Social Security Ruling 96-7P, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (S.S.A. July 2, 1996) (applicable to claims filed prior to Mar. 16, 2016)).

reviewers to dissect Plaintiff's credibility to be unavailing. For instance, in-house medical consultant Dr. Schnars noted that when rheumatologist Dr. Stone examined Plaintiff in 2014, there was "no documentation of fatigue or limitations of functionality during [Dr. Stone's] 5/14 evaluation which is commented upon during 7/14 letter of advocacy." However, a review of the medical records indicates that Plaintiff consistently and routinely complained of fatigue and joint pain to all of his physicians. The fact that Dr. Stone, as well as Plaintiff's other medical providers such as Dr. Moreland, Dr. Levy, Dr. Grisanti, Dr. Rajarathna, "relied on [his] subjective complaints hardly undermines [their] opinion[s] as to [his] functional limitations, as '[a] patient's report of complaints, or history, is an essential diagnostic tool.'" Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (quoting Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997); last alteration in original).

Dr. Schnars and other of Defendant's medical consultants also found Plaintiff's symptomatology not credible because his course of treatment was not sufficiently "aggressive." For instance, Dr. Schnars noted that it was recommended on a few occasions that Plaintiff take steroid-sparing agents but none were initiated. Based on the Court's reading of the medical records, it appears that this recommendation was made largely to mitigate Plaintiff's significant adverse effects from prednisone, such as steroid-

induced diabetes and mental status changes. While Dr. Schnars asserted that Plaintiff took no medication for chronic pain, notes from nephrologist Dr. Wu indicate that Plaintiff occasionally took Celebrex, a pain medication[13] prescribed by rheumatologist Dr. Liu. On February 29, 2008, Dr. Liu informed primary care physician Dr. Toma that Plaintiff's "joint pain is still problematic but with his BP [blood pressure] issues-we have not increased the Celebrex." PLA-CL-IDI-00110. Dr. Schnars and Dr. Bress found that Plaintiff's statements about the severity of his symptoms were undercut by the fact that he was only taking 10 mg of prednisone. However, the record shows that higher daily dosages "led to side-effects of depression, mania and psychosis[.]" PLA-CL-IDI-001029. Plaintiff has stated that he still experiences break-through pain even when on prednisone. PLA-CL-IDI-000170.

Appeals Specialist Enberg, Dr. Schnars and Dr. Paty relied on the fact that Plaintiff continued to work after Dr. Moreland completed the supporting disability papers to show that Plaintiff was not disabled from performing his occupation. Dr. Schnars also cited a Hospital representative's comment that the date of disability was within two weeks of Plaintiff's being terminated

---

[13]    Celebrex® (celecoxib) is a non-steroidal anti-inflammatory in the COX-2 inhibitor family used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints).
https://medlineplus.gov/druginfo/meds/a699022.html (last accessed May 1, 2019).

from his position. However, the reason given by the Hospital for Plaintiff's termination was that he was not meeting billing expectations or seeing enough patients. This actually tends to corroborate the statements Plaintiff made in 2013 to Dr. Moreland and Dr. Rajarathna that his pain and fatigue were increasing in severity to the point that he was unable to keep up the pace required of him at work, and he therefore planned to seek disability. In his sworn certification, Plaintiff stated that he understood why the Hospital was choosing not to renew his employment contract and that the Hospital had offered him work as an independent contractor; however, he turned it down because he could not manage practicing medicine at a reduced level. The fact that Plaintiff persevered in continuing to work despite his chronic fatigue and pain should not be used against him. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."). Indeed, "numerous courts have recognized that a disability claimant can still be found to be disabled even if he or she worked for some period after the onset of disability." Perryman v. Provident Life & Accident Ins. Co., 690 F. Supp.2d 917, 950 (D. Ariz. 2010) (fact that claimant continued to work for three years after diagnosis of chronic fatigue syndrome was, by itself, insufficient to establish that she was not disabled under ERISA disability plan's "any occupation" provision, where

there was evidence that she experienced serious problems working during that period) (citing <u>Hawkins v. First Union Corp. Long-Term Disability Plan</u>, 326 F.3d 914, 918 (7th Cir. 2003) (in an ERISA fibromyalgia case, noting that there is no "logical incompatibility between working full time and being disabled from working full time" because "[a] desperate person might force himself to work despite an illness that everyone agreed was totally disabling" but "even a desperate person might not be able to maintain the necessary level of effort indefinitely."); <u>Rochow v. Life Ins. Co. of N. Am.</u>, 482 F.3d 860, 865 (6th Cir. 2007) (disability claimant's presence on the payroll subsequent to the alleged disability onset date is not determinative as to whether he was disabled during that time); other citation omitted).

Defendant and its medical consultants also found Plaintiff's limited daily activities to be inconsistent with the degree of pain and fatigue alleged by Plaintiff and with the disability-supporting opinions by Dr. Moreland. Dr. Paty in particular cited Plaintiff's ability to read, use the computer, do occasional household chores, and grocery shop. There is, quite obviously, nothing inherent in these activities that proves Plaintiff has the ability to perform the exertional and cognitive demands of a hospital neurologist, much less to do so eight hours a day, five days a week, or, during the periods when he was "on call," to be able to do them twenty-four hours a day, seven days a week, if necessary. Courts in this

Circuit repeatedly have recognized in the SSDI context that a "claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a [full-time] job" in the competitive workforce. <u>Polidoro v. Apfel</u>, No. 98 CIV.2071(RPP), 1999 WL 203350, at *8 (S.D.N.Y. Apr. 12, 1999) (citing <u>Carroll v. Sec'y of Health and Human Servs.</u>, 705 F.2d 638, 643 (2d Cir. 1983) (finding that Secretary failed to sustain burden of showing that claimant could perform sedentary work on the basis of (1) testimony that he sometimes reads, watches television, listens to the radio, rides buses and subways, and (2) ALJ's observation that claimant "'sat still for the duration of the hearing and was in no evident pain or distress'"; circuit found "[t]here was no proof that [claimant] engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job")).

Having read the entire Administrative Record along with all of the parties' submissions in connection with their respective dispositive motions and the R&R, the Court is convinced of Plaintiff's credibility regarding the debilitating nature of the subjective symptoms caused by his illnesses, in particular his severe fatigue and pain.

**CONCLUSIONS OF LAW**

-43-

The following section constitutes the Court's conclusions of law, pursuant to Fed. R. Civ. P. 52(a)(1). To the extent that any conclusion of law reflects a finding of fact, it shall to that extent be deemed a conclusion of law. Barbu, 35 F. Supp.3d at 280. As noted above, the parties have stipulated to review under the de novo standard. Under this standard, Plaintiff bears the burden of proving by a preponderance of the evidence that he was disabled as defined by the Disability Policy and therefore entitled to benefits under it. Kagan v. Unum Provident, 775 F. Supp.2d 659, 671 (S.D.N.Y. 2011) (citing Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 441 (2d Cir. 2006) (on de novo review of an ERISA plan administrator's decision claimant has burden of proving disability under the policy by a preponderance of evidence); Richards v. Hewlett-Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010) (same)).

## I. Resolution of the Parties' Objections to the R&R

### A. Standard of Review

Should either party object to a magistrate judge's report and recommendation, "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The Second Circuit has clarified that "[e]ven if neither party objects to the magistrate's recommendation, the district court is not bound by the recommendation of the

magistrate." <u>Grassia v. Scully</u>, 892 F.2d 16, 19 (2d Cir. 1989), Rather, "'[a] judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.'" <u>Id.</u> (quoting 28 U.S.C. § 636(b)(1); citing <u>Mathews v. Weber</u>, 423 U.S. 261, 271 (1976); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237 n. 2 (2d Cir. 1983)).

### B.  Defendant's Objections

Defendant filed Objections ("Def.'s Obj.") (Docket No. 40) asserting that the R&R (1) improperly admitted evidence outside the administrative record without a showing of good cause by Plaintiff, <u>see</u> Def.'s Obj. at 4-6; (2) erred by determining that "facts" underlying other insurers' decisions, which are not part of the record, may be considered at a subsequent bench trial, <u>see</u> <u>id.</u> at 6-8; (3) erroneously relied on a claims manual issued by Defendant that is not part of the administrative record, <u>see</u> <u>id.</u> at 8-11; (4) incorrectly recommended that a bench trial is necessary, <u>see</u> <u>id.</u> at 11-14; and (5) erroneously concluded that Unum Group, Defendant's corporate parent, is the plan administrator, <u>id.</u> at 14-15.

### 1.  Admission of Evidence Without Good Cause

On January 5, 2016, rheumatologist Dr. Carette issued a "Reassessment Summary," indicating that Plaintiff had been diagnosed with granulomatosis with polyangiitis ("GPA"), formerly known as Wegener's granulomatosis. The following day, January 6,

2016, at a status conference with Magistrate Judge Foschio, Plaintiff's counsel acknowledged on behalf of his client that no discovery beyond the Administrative Record was necessary. Subsequently, in support of his summary judgment motion, Plaintiff sought admission of Dr. Carette's Reassessment Summary because it was relevant to proving that "he is totally disabled." Docket No. 25-3 at 11. Defendant countered that the Reassessment Summary was not part of the Administrative Record and that Plaintiff had failed to meet his burden of establishing good cause for its admission and consideration. Plaintiff replied that "a new diagnosis is good cause."

The R&R correctly stated that in the Second Circuit "the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause." DeFelice v. American Int'l Life Assurance Co. of New York, 112 F.3d 61, 66 (2d Cir. 1997). The R&R then concluded that Plaintiff established good cause to admit Dr. Carette's Reassessment Summary because the diagnosis was based upon objective medical testing and physical examination, and therefore was "highly probative" of Plaintiff's disabling condition. R&R at 41. Somewhat confusingly, however, Plaintiff's counsel did not make such an argument and, in fact, admitted that Dr. Carette's Reassessment Summary was not material to the question of whether Plaintiff is disabled and entitled to

benefits. See Declaration of Robert J. Rosati, Esq. (Docket No. 25-2) ¶ 2 ("The point of this declaration is to bring to the Court's attention facts regarding the case, but not material to the question of whether or not Dr. Khan is disabled and entitled to benefits.").

Moreover, the probative value of extra-record evidence to a claimant's disability status is not the test for determining if "good cause" exists to augment the administrative record. The Court does not find Tritt v. Automatic Data Processing, Inc. Long Term Disability Plan, No. 3:06-CV-2065 RNC, 2012 WL 3309380, at *10 (D. Conn. Aug. 13, 2012), aff'd, 531 F. App'x 177 (2d Cir. 2013), to be controlling here. Tritt involved the weight to be accorded to a retrospective diagnosis already part of the record in an ERISA case. See Tritt, 2012 WL 3309380, at *10.

Likewise, Paese, 449 F.3d at 441, is distinguishable. In that case, the district court found that good cause existed for the admission of the report because it was *highly probative* and written by a disinterested party who had actually examined Paese, and *because Paese was not at fault for the report's initial absence from the record*." Id. (emphasis supplied). Here, the record was not created until after the Administrative Record was closed. At the same time, Plaintiff arguably is not at fault for the absence of the report's *contents* from the Administrative Record. Dr. Carette's notes suggest that information which possibly could have led to an

-47-

earlier diagnosis of GPA may have been overlooked by Plaintiff's treatment providers. See Docket No. 25-2, p. 16 of 36. Dr. Carette's diagnosis of GPA was made after he repeated an ANCA [Antineutrophil Cytoplasmic Antibody] test in June 2015, based on his observation that Plaintiff was "once found to have positive ANCA's in an outside lab (method of detection not determined nor was the type of ANCA)." Id. Dr. Carette repeated this test, which yielded positive anti-PR3. Plaintiff's history of scleritis, polyarthralgia and positive findings in his urine suggestive of glomerulonephritis, combined with his last serology assessment showing positive anti-PR3, "[a]ll . . . point[ed] to ANCA associated vasculitis (Granulomatosis and polyangitiis). . . ." Id., p. 14 of 36. On June 30, 2015, before ordering the new ANCA test, Dr. Carette noted they "still don't have a clear diagnosis. . . ." Id., p. 16 of 36. And, as Plaintiff points out, Wegener's granulomatosis was considered as a diagnosis years ago.

While Dr. Carette's notes thus suggest that the diagnosis of GPA was retrospective in nature, it is not clear. Also, as Plaintiff argues, the Disability Policy does not require that he have a definitive or certain diagnosis. Thus, it is difficult to describe Dr. Carette's report as "highly probative" on the issue of whether Plaintiff was disabled at the time he applied for benefits. Under Paese, the Court does not find good cause to admit Dr. Carette's Reassessment Summary as proof that Plaintiff was disabled

as of June 10, 2013, because Plaintiff has not established that the document was "highly probative" and was not included in the Administrative Record through no fault of his own. The Court therefore rejects this finding of the R&R.

## 2. Admissibility of Other Insurers' Decisions

The R&R correctly found that the favorable claims decisions issued by The Hartford and MetLife, from whom Plaintiff had purchased disability policies, were not binding on this Court. R&R at 46 (citing Kocsis v. Standard Ins. Co., 142 F. Supp.2d 241, 252-53, 255 (D. Conn. 2001) (finding that Standard was "not bound by the decision of Phoenix, another disability insurer, regarding the plaintiff's eligibility for benefits under an entirely separate insurance policy")). The R&R went on to find that the "facts" that The Hartford and MetLife awarded long-term disability benefits "may be considered at a bench trial." R&R at 46 (citing Frischman v. Fleming, 193 F. Supp. 619, 624 (E.D.N.Y. 1961)).

The Court agrees with Defendant that Frischman is inapposite to this ERISA matter for several reasons. Most importantly, Frischman stands only for the unremarkable proposition that physician's medical reports as to a claimant's disability could be considered by, but are not binding on, the SSA. Here, however, the other insurers' decisions are not actually in the Administrative Record; nor are the policies they issued or the records they considered. The only information available to the Court is

-49-

Plaintiff's assertion that he was "quickly" awarded benefits by The Hartford and MetLife.

It would demand too much of <u>Frischman</u> to read it as stating that other insurers' decisions, based on different policies containing different definitions of disability, would be relevant to this Court's determination whether *this* claimant is disabled under the policy he purchased from *this* insurer. The Court accordingly rejects this portion of the R&R.

### 3.    Reliance on Claims Manual Not in the Record

The R&R noted that Plaintiff presented an argument to the effect that "Defendant's own claims manual requires the SSA's decision to be given 'significant weight.'" R&R at 43. Defendant objects to this observation because the claims manual itself is not in the Administrative Record and because Plaintiff did not mention the claims manual until he filed his reply brief. Defendant also objects to the R&R's finding that the SSA's decision is relevant and should be given "'significant weight,' as required under the Disability Policy." R&R at 46.

To the extent the R&R asserted that the Disability Policy requires significant weight to be accorded to a decision by the SSA, this is inaccurate: The Disability Policy mentions nothing whatever about decisions by the SSA. However, as Plaintiff counters, the Administrative Record contains evidence, from at least two employees, that the claims manual applicable to deciding

claims under the Disability Policy *does* require significant weight to be given to the SSA's disability decisions.

First, Appeals Specialist Enberg sought input from in-house attorney Nancy M. Smith ("Attorney Smith") regarding the caselaw cited in Plaintiff's appeal letter. In her response, Attorney Smith

> note[d] that the Insured was awarded SSDI benefits. *Under the claim manual, the company must provide significant weight to that decision*. The administrative record would include the information provided by him that the other carriers are providing benefits.
>
> In an [sic] response you should note that the company has conducted a full and fair evaluation of the Insured's eligibility for benefits consistent with its obligations under the policy and ERISA.

PLA-CL-IDI-000929 (emphasis supplied).

On September 11, 2014, Appeals Specialist Enberg informed Attorney Quiat that he was awaiting receipt of the SSDI file. Appeals Specialist Enberg "explained that if the opinion of the rheumatologist supports disability, the SSDI file would not be necessary to complete appeal. However, *if the rheumatologist does not support disability we are still required to provided significant weight to SSDI*." PLA-CL-IDI-001212 (emphasis supplied). As the R&R notes, Defendant "'admits that the administrative record contains claim notes, which speak for themselves.'" R&R at 44 n. 12 (quoting Defendant's Response Statement of Facts (Docket No. 27-2) ¶ 72; alteration omitted). In light of the foregoing, the Court finds no error in the R&R's analysis of the SSA decision and the weight to be accorded to it under the claims manual applicable to

Plaintiff's Disability Policy.

Finally, Defendant's assertion that "the record contains none of the information on which the SSA based its decision," Def.'s Obj. at 10, is incorrect. The Administrative Record contains the entire SSA file, and the SSA's decision indicates which medical records were requested, obtained, and considered.

### 4. Recommendation for a Plenary Bench Trial

Because the parties have consented to a bench trial "on the papers" before this Court, the R&R's recommendation that a plenary bench trial is necessary, see R&R at 53-54, has been rendered moot.

### 5. The Identity of the Claims Administrator

Defendant objects that the R&R misconstrued the facts related to the identity of the claims administrator. In particular, the R&R asserted that "[a]ll claims under the Disability Policy are administered by Defendant's corporate parent and agent Unum Group." R&R at 9. Defendant notes that the R&R provided no citation to the record to support this statement. In its Response to Plaintiff's Statement of Material Facts, Defendant denied Plaintiff's assertion that all decisions and all actions were made by Unum Group. Instead, Defendant stated that "Provident admits that employees of Provident's parent, Unum Group, administered and made benefits determinations on [P]laintiff's claim on behalf of Provident."

It is not clear to the Court what practical difference the precise identity of the claims administrator makes to the

disposition of this case, since there is no dispute about which standard of review applies. Cf., e.g., Daniel v. UnumProvident Corp., 261 F. App'x 316, 318 (2d Cir. 2008) (unpublished opn.) (district court could consider agreement between insurer and its parent corporation, even though it was not in administrative record, where agreement was offered not to establish historical fact pertaining to merits of claim, but to answer question that was not, and could not have been, considered by plan administrator, i.e., which entity decided claim and, therefore, which standard of review was applicable in federal court). Therefore, the Court rejects Defendant's objection as moot.

### C. Plaintiff's Objections

Plaintiff objects to the R&R's finding that Plaintiff's doctors' opinions conflict with the opinions of Defendant's reviewing medical professionals, thereby creating genuine issues of material fact which preclude summary judgment in Plaintiff's favor. Plaintiff asserts that the opinions from Defendant's medical professionals (1) are not relevant to the issues presented; (2) do not rebut Plaintiff's doctors' opinions; and (3) are based on a lack of objective medical evidence that is not required by the policy. See Plaintiff's Objections ("Pl.'s Obj.") (Docket No. 41) at 1; see also id. at 2-5. According to Plaintiff, "Defendant's doctors provide[d] no opinion on the issue presented by the case—whether [Plaintiff] is disabled," but instead "only provided

-53-

opinions as to whether 'objective medical evidence' prove[s] [Plaintiff] is disabled." Id. at 3. Because the Policy does "not require objective medical evidence," and Plaintiff is "disabled by fatigue, which "is not susceptible to proof by objective medical evidence," id., their opinions are irrelevant. Id.

Defendant responds that the R&R correctly determined Plaintiff was not entitled to judgment as a matter of law because Plaintiff failed to meet his burden of proving his disability under the terms of the Policy, namely, that he was unable, by reason of sickness or injury, to perform each of the material duties of his occupation. See Defendant's Response to Plaintiff's Objections (Docket No. 45) at 3. Defendant asserts that it properly declined to credit Plaintiff's doctors' because their opinions merely recite his subjective complaints of pain and fatigue, and they never performed any tests to confirm, objectively, the extent of the limitations caused by Plaintiff's complaints. Defendant further disputes Plaintiff's assertion that he did not need to support his claim with objective medical evidence, given that the Policy states that Defendant "can require any proof that [it] consider[s] necessary to consider [his] claim.'" Id. at 4 (quotation and boldface omitted).

As discussed further below, the Court finds that Plaintiff has established by a preponderance of the evidence that he is entitled to long-term disability benefits under the "Your Occupation" provision of the Disability Policy.

**1.    Defendant Imposed a Requirement of Objective Proof That Is Not Contained in the Policy**

Under de novo review, in contrast to arbitrary and capricious review, the Court determines the meaning of plan provisions without deference to the claims administrator's interpretation. E.g., Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1273 (2d Cir. 1995).  The Second Circuit employs the doctrine of contra proferentem to construe ambiguous language in contracts governed by ERISA, where, as here, review is de novo rather than arbitrary and capricious. Masella v. Blue Cross & Blue Shield of Conn., Inc., 936 F.2d 98, 107 (2d Cir. 1991).

As an initial matter, the Court notes that as the drafter of the Disability Policy, nothing prevented Defendant from inserting a coverage exception for claims of disability based on self-reported or subjective symptoms and limitations. The Disability Policy at issue here has no exception to coverage for such claims, so Defendant has assumed the risk of having to pay claims based on diseases, such as Plaintiff's, that are difficult to diagnose and to quantify. See Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 678 (9th Cir. 2011) (ERISA plan had "no exception to coverage for chronic fatigue syndrome, so CIGNA has taken on the risk of false claims for this difficult to diagnose condition").

In describing the type of written proof that is required, the Disability Policy employs the amorphous term "any evidence." By not specifying what type of evidence would be required or how it would

-55-

be weighed, Defendant left itself a loophole to interpret the Disability Policy to mean that *only* objective proof is satisfactory to prove a claimant is disabled. Indeed, Defendant's interpretation effectively precludes any claimant who has a sickness or disease that manifests in mainly "subjective" symptoms from being awarded benefits. The Court rejects this interpretation as being contrary to the remedial purpose behind ERISA. See <u>Masella</u>, 936 F.2d 98, 107 (failing to employ <u>contra</u> <u>proferentem</u> would "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted, a result that would be at odds with the congressional purposes of promoting the interests of employees and beneficiaries and protecting contractually defined benefits") (internal quotation marks and quotation omitted).

> **2.    Defendant and Its Medical Consultants Arbitrarily Ignored Plaintiff's Subjective Complaints**

"It has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability.'" <u>Connors</u>, 272 F.3d at 136–37 (quoting <u>Mimms v. Heckler</u>, 750 F.2d 180, 185 (2d Cir. 1984)). Fatigue is likewise the type of symptom that may not be discounted simply because the amount of fatigue an individual experiences is subjective in nature. See, e.g., <u>Hawkins v. First Union Corp. Long-Term Disability Plan</u>, 326 F.3d 914, 919 (7th Cir. 2003) (noting that "the amount of pain and fatigue that a particular case of [chronic fatigue syndrome] produces cannot be [measured

objectively]" and rejecting medical opinion "that because it is subjective [the claimant] is not disabled"); Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997) (in a case where claimant alleged chronic fatigue syndrome, which "has no known etiology, it would defeat the legitimate expectations of participants . . . to require those with CFS to make a showing of clinical evidence of such etiology as a condition of eligibility for LTD benefits") (internal quotation marks and citations omitted).

Although the district court, on de novo review of an ERISA plan administrator's decision, "is not required to accept [a claimant's subjective] complaints as credible[,]" Connors, 272 F.3d at 136 (citing Aponte v. Sec'y of the Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)), "it cannot dismiss complaints of pain as legally insufficient evidence of disability[.]" Id. (citations omitted). Here, the Court already has found Plaintiff's subjective complaints to be fully credible. See Section VI, supra. The Court will proceed to examine the legal sufficiency of that evidence.

In the Second Circuit, a plaintiff's subjective complaints, if believed, can be sufficient to establish disability. See Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983) (characterizing SSDI claimant's frequent complaints to his wife and neighbor of headaches and neck pains and his testimony about same as

"overwhelming, substantial evidence" of the extent of claimant's pain); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979) ("[T]he subjective evidence of appellant's pain, based on her own testimony and medical reports of examining physicians, is more than ample to establish her disability, if believed.")). Indeed, "[m]any medical conditions depend for their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established until autopsy. In neither case can a disability insurer condition coverage on proof by objective indicators such as blood tests where the condition is recognized yet no such proof is possible." Salomaa, 642 F.3d at 678.

However, this is exactly what Defendant did here. Drs. Bress, Schnars, Paty and Bello relied on the lack of "laboratory data" and "objective" clinical findings to find Plaintiff's complaints of fatigue and pain unsubstantiated. Defendant's medical reviewers largely ignored the abnormal bone scans performed in 2006 that were suggestive of a polyarthralgia. And, they have not stated what types of laboratory results they would have expected to see in a person with Plaintiff's disease profile and symptoms. As far as examination findings, they expected to see such things as a fatigued appearance, joint swelling and decreased range of motion, or the inability to get on the examination table. Defendant's consultants have not pointed to any medical authority stating that swelling and decreased range of motion always occurs in cases of

polyarthralgia secondary to relapsing polychrondritis. Contrary to Defendant's suggestion, whether a patient "looks" tired is, of course, a wholly subjective judgment. Rheumatologist Dr. Moreland explained that there is no blood test or approved questionnaire that accurately measures fatigue, and most often his patients have normal laboratory results and examinations. Defendant's medical experts' opinions demanded unspecified types of objective proof that, given the nature of Plaintiff's diagnoses and symptoms, is essentially impossible to obtain.

Defendant's medical reviewers' opinions collectively constitute an unfavorable referendum on Plaintiff's credibility, formed without the benefit of examining Plaintiff in person. The Court recognizes that while plan administrators may not arbitrarily reject or refuse to consider the opinions of a treating physician, they "are not obligated to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). Here, given the nature of Plaintiff's disease, any opinion as to his physical limitations necessarily had to be based in large part on his subjective sensations of fatigue and pain. A "'special problem'" arises where, as here, "credibility determinations are at stake: if 'the conclusions from [a non-treating physician's] review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate.'" Holt

v. Life Ins. Co. of N. Am., No. 1:13-CV-339, 2015 WL 1243529, at *5 (E.D. Tenn. Mar. 18, 2015) (quoting Calvert v. Firstar Fin., Inc., 409 F.3d 286, 297 n. 6 (6th Cir. 2005)). The "special problem" described in Calvert is dramatically illustrated by this case, where Defendant, despite having the authority to conduct an in-person medical examination or functional capacity evaluation, chose not to do so and instead repeatedly sought paper reviews of Plaintiff's case. This "'[r]aises questions about the thoroughness and accuracy of the benefits determination.'" Holt, 2015 WL 1243529, at *5 (plan administrator's failure to invoke right to physical examination claimant, who suffered from fibromyalgia, contributed to finding that its denial of benefits was arbitrary and capricious, given nature of claimant's illness) (quoting Calvert, 409 F.3d at 293; alteration in original)); see also Smith v. Cont'l Cas. Co., 450 F.3d 253, 263-64 (6th Cir. 2006) (holding that a non-treating physician's characterization of the claimant's "subjective complaint[s]" as "out of proportion to physical findings" contributed to the arbitrary nature of the plan's denial of benefits because it involved the type of credibility determination best made by a treating physician).

### 3. Defendant Ignored Evidence Regarding the Actual Vocational Requirements of Plaintiff's Job and His Ability to Perform Them

Although Defendant's medical experts unanimously critiqued Dr. Moreland for not assigning sufficiently specific "Restrictions &

Limitations," they overlooked the fact that Dr. Moreland did complete a form at Defendant's request in which he gave an opinion as to Plaintiff's exertional limitations. In particular, Dr. Moreland estimated Plaintiff's ability to sit, stand, and walk as "occasional," which Defendant's form defined as 1 to 33 percent of a workday. Defendant's vocational expert, VRC Gaughan, provided an opinion as to the exertional and cognitive requirements of Plaintiff's job as a hospital neurologist, concluding that it was a "light" exertional level job which required standing for around 6 hours a day, well over 33 percent of a workday. Apparently, however, neither Defendant nor its medical reviewers considered this evidence as they did not mention Dr. Moreland's form providing specific physical limitations or VRC Gaughan's vocational assessment.

While Defendant's outside medical consultant Dr. Bello remarked in passing that a hospital-based neurology position is "sedentary to light" in exertion, he is not a vocational expert and he did not analyze Plaintiff's specific position, unlike VRC Gaughan. Consistently with VRC Gaughan, the SSA determined that, according to the DOT, the strength level of Plaintiff's previous position was "light." However, discussion or mention of the SSDI decision was conspicuously absent from the reports issued by Defendant's medical consultants, notwithstanding admissions by Appeals Specialist Enberg and Attorney Smith that the claims manual

applicable to deciding Plaintiff's disability claim required "significant weight" be accorded to a decision from the SSA. Defendant's chief justification for discounting the SSA's decision—that no medical expert reviewed Plaintiff's SSDI claim or provided an opinion—is unpersuasive, given that Defendant's consultants did not directly address whether Plaintiff is unable to perform the material and substantial duties of his occupation but instead attacked on his credibility. It further demonstrates that the opinions of Defendant's medical reviewers hardly constitute "compelling evidence" for ignoring the SSA's decision.

In sum, the Court finds that Plaintiff has established by a preponderance of the evidence that he is unable, due to sickness or disease, to perform the material and substantial duties of his occupation as a hospital neurologist, and he therefore is disabled under the "Your Occupation" provision of the Disability Policy.

**D.    Remand for Defendant to Consider the "Any Occupation" Claim Is Unnecessary**

The R&R correctly found that Plaintiff's failure to exhaust administrative remedies with regard to the "Any Occupation" claim is not a jurisdictional defect in the ERISA context but is an affirmative defense. The R&R found that Defendant had waived the affirmative defense, and that Plaintiff likewise had waived the opportunity to raise the argument of Defendant's waiver. R&R at 55. In light of the "federal policy favoring exhaustion" in ERISA cases, and absent a "clear and positive showing" that remand would

-62-

be "futile," the R&R recommended dismissing the "Any Occupation" claim without prejudice. Id. at 56.

The Court notes that when reviewing under the arbitrary and capricious standard, the Second Circuit has directed that an unexhausted claim be remanded "unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'" Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995) (quoting Wardle v. Central States, Southeast & Southwest Areas Pension Fund, 627 F.2d 820, 828 (7th Cir. 1980); further citation omitted). Here, the Court's review is under the less deferential de novo standard.

At the time of Defendant's final adverse decision in 2004, the record in this case spanned 8 years and included a finding of disability by the SSA that is basically equivalent to a finding of disability under the "Any Occupation" standard. No reasonable argument can be made that record is incomplete. It is true that Defendant could obtain "new" evidence in the form of an in-person independent medical examination or functional capacity evaluation of Plaintiff. However, Defendant had more than ample time and opportunity to order such examinations, yet deliberately declined to do so.

After reviewing the entire Administrative Record, the Court finds that no new evidence could produce a reasonable conclusion permitting a non-arbitrary denial of Plaintiff's claim under the

"Any Occupation" standard. Remand would, in this case, be a useless formality. The Court further finds that the Administrative Record establishes, by a preponderance of the evidence, that Plaintiff is unable, due to sickness or disease, to perform the material and substantial duties of any occupation and, as such, is disabled under the "Any Occupation" provision.

## SUMMARY

The Court concludes that, based on the Administrative Record, Plaintiff has established by a preponderance of the evidence that he is entitled to long-term disability benefits under the "Your Occupation" provision in the Disability Policy, and that Defendant erred in denying Plaintiff's claim under that provision. Plaintiff accordingly is entitled to the payment of benefits under the "Your Occupation" provision as stated in the Disability Policy.

In addition, the Court declines to remand the matter to Defendant for consideration, in the first instance, of Plaintiff's claim under the "Any Occupation" provision. The Court has found that, based on the Administrative Record, Plaintiff has established by a preponderance of the evidence that he is entitled to benefits under the "Any Occupation" provision. Plaintiff accordingly is entitled to the payment of benefits under the "Any Occupation" provision as stated in the Disability Policy.

Because the Court is not in a position at this time to determine the exact amount of those benefits, the Court will

require the parties to confer regarding the wording of a proposed judgment. In addition to discussing the amount of benefits, the parties shall confer on the issue of whether Plaintiff is entitled to attorney's fees and non-taxable expenses under 29 U.S.C. § 1132(g)(1) and if so, in what amount. The parties shall also confer regarding the appropriate pre-judgment interest rate and start date.

While the Court expects the parties to make every reasonable effort to resolve all remaining issues through the joint submission of a proposed judgment, if the parties, after a good faith effort to do so, cannot agree on the wording of a proposed judgment, the parties each may separately submit a proposed form of judgment, accompanied by a memorandum of points and authorities that sets forth the party's positions regarding the amount of benefits, the amount of attorney's fees, and the amount of pre-judgment interest.

## ORDERS

For the foregoing reasons, it is hereby

**ORDERED** that the R&R (Docket No. 33) is accepted in part and rejected in part; Plaintiff's Motion for Summary Judgment/Alternative Motion for Judgment Pursuant to Fed. R. Civ. P. 52 (Docket No. 25) is granted; and Defendant's Motion for Judgment on the Administrative Record (Docket No. 23) is denied. It is further

**ORDERED** that Plaintiff is awarded long-term disability

insurance benefits pursuant to the "Your Occupation" and the "Any Occupation" provisions of Disability Policy No. 06-6297809 issued by Defendant for the period commencing June 10, 2013, through the date of his 67th birthday. It is further

**ORDERED** that the parties shall report to the Court in writing within 20 days regarding their efforts to reach consensus on the following issues: (1) the amount of past-due long-term benefits; (2) whether Plaintiff is entitled to attorney's fees under 29 U.S.C. § 1132(g)(1), and if so, in what amount; and (3) the rate and amount of pre-judgment interest to be awarded.

**SO ORDERED.**

**s/ Michael A. Telesca**

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      May 3, 2019
            Rochester, New York